THE STATE OF OHIO, APPELLEE, *v.* LEONARD, APPELLANT.

[Cite as *State v. Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235.]

(No. 2001–1589—Submitted July 20, 2004—Decided December 8, 2004.)

O'CONNOR, J.

{¶ 1} On July 29, 2000, Patrick T. Leonard, defendant-appellant, followed Dawn Flick, his former fiancée, while she was driving her car, forced her to a stop, and ordered her to return to her home. Leonard followed Flick to her house, and, once inside, Leonard handcuffed Flick, attempted to rape her, and then shot her three times in the head. Leonard was convicted of the aggravated murder, attempted rape, and kidnapping of Flick and was sentenced to death.

{¶ 2} Leonard and Flick became engaged in the fall of 1995. During their engagement, Leonard fathered a son by Penny McBride. Leonard and Flick ended their engagement in 1998 but continued to date. Leonard also continued his relationship with McBride. Approximately nine months before Flick was murdered, a second child was born to Leonard and McBride. Leonard tried to conceal from Flick and others that he was the child's father.

{¶ 3} The evidence presented at Leonard's trial indicated that Flick had intended to end her relationship with Leonard. In his confession, Leonard stated that he had a "broken heart" because he was losing Flick. On Friday, July 28, 2000, the day before the murder, Leonard told Alvie Woods, a friend of Leonard's and Flick's, that if he caught Flick "fooling around" with anyone, Leonard would kill somebody. According to Woods, Leonard had said, "[I]f I can't have her, no one can."

{¶ 4} Flick tended bar at her family's restaurant, Les Flick's Home Like Inn, on the evening of July 28 and early morning of July 29. After the restaurant closed for the night, Flick drove to Snow's Lake Bar to meet some friends. Leonard followed Flick and, according to his confession, "got her to pull over." Leonard then confronted Flick about her earlier statement that she would be staying home for the evening. Leonard left Flick alone after she agreed to call him when she returned home. When she arrived at Snow's, Flick appeared upset, according to Woods, Deborah Schroeder, and Reva Ketterer, and she told them that Leonard had just run her car off the road.

{¶ 5} When Snow's closed for the night, Flick planned to go to the house of her friend, Ryan Gries. Leonard followed Flick as she drove to Gries's house and again stopped her car. Leonard ordered Flick to return to her home, and he followed her there. Once inside, Leonard handcuffed her wrists. Leonard then pointed a gun at Flick as she called to tell Gries that she was not coming to his house. During their telephone conversation, Gries was able to elicit from Flick that she was with Leonard and was in danger.

{¶ 6} Gries and his friend Frank Minges rushed to Flick's house. When Leonard heard Gries's truck drive up, he shot Flick three times in the head. He then fired through the door, striking Gries in the chest. Gries and Minges left to call the police, and Leonard fled in his truck.

{¶ 7} Leonard then called a friend, Sergeant Nick Chaplin, a deputy sheriff in Campbell County, Kentucky. Leonard told Chaplin that he had shot and killed Flick, and he agreed to surrender to Chaplin. Leonard drove to Kentucky, where he was taken into custody.

{¶ 8} After being advised of his *Miranda* rights, Leonard gave a taped statement confessing to Flick's murder. In his confession, Leonard admitted that before shooting Flick, he had restrained her with handcuffs. Leonard said that he and Flick had talked about "making love [and had] decided to do that on the floor." Leonard said that when he had heard Gries's truck drive up, he jumped up off of Flick, pulled his pants up, and shot Flick three times in the head. Leonard also admitted having shot at Gries and Minges through Flick's front door.

{¶ 9} Police officers investigating the shooting found Flick's partially clothed body lying in a pool of blood in her living room. Flick's panties were down to her thighs, one pant leg was completely off, the other pant leg was around her calf, and one shoe was off. Her wrists were bound by handcuffs.

{¶ 10} Dr. Robert Pfalsgraf, chief deputy coroner, determined that the cause of death was a gunshot wound to the head. Flick had been shot once in the face, once in the back of the head, and once in the back of her neck at the hairline. The shot to the back of Flick's head was fatal.

{¶ 11} Pfalsgraf found no injuries to Flick's vagina or anus and no semen in those areas. Pfalsgraf noted, however, that this lack of evidence did not preclude a finding that Leonard had penetrated Flick.

{¶ 12} Pfalsgraf also testified that the pattern of bruising on Flick's wrists corresponded to the handcuffs found on her wrists. Petechiae were found on her face and neck, indicating ruptured blood vessels caused by strangulation. Flick also had ligature bruising on her neck that matched the pattern of the necklace

she was wearing. Based on these injuries, the coroner concluded that Flick had been strangled and had struggled with her assailant while she was handcuffed.

{¶ 13} Leonard was indicted on two counts of aggravated murder. The first count charged Leonard with purposely causing Flick's death while committing or attempting to commit rape. R.C. 2903.01(B). The second count charged Leonard with purposely and with prior calculation and design causing Flick's death. R.C. 2903.01(A). Leonard was also indicted for attempted murder in Counts Three and Four (R.C. 2903.02 and 2923.02), rape in Count Five (R.C. 2907.02[A][2] ), and kidnapping in Count Six (R.C. 2905.01[A][2] ).

{¶ 14} The aggravated-murder counts each contained two death-penalty specifications. The first specification charged aggravated murder as part of a course of conduct to kill or attempt to kill two or more persons. R.C. 2929.04(A)(5). The second specification charged aggravated murder during a rape or an attempted rape. R.C. 2929.04(A)(7). Gun specifications were included with all counts except Count Six, kidnapping.

{¶ 15} At trial, the defense presented testimony from five witnesses and other documentary evidence. Leonard did not testify. During defense counsel's opening statement, counsel conceded that Leonard had shot Flick. However, the defense's theory was that Leonard had been trying to salvage his relationship with Flick, had not intended to kill her, and had not acted with prior calculation and design. The defense also contested the charges of rape and kidnapping and denied that Leonard had attempted to murder Gries and Minges.

{¶ 16} The defense introduced evidence to show that Leonard had purchased a planter with flowers from Renck's Garden Center and had given it to Flick as a gift on the afternoon before the murder.

{¶ 17} Eddie Sayers, an employee of Sam's Corner Store in New Baltimore, Ohio, testified that both Leonard and Flick had been in the store the day before the murder: Leonard in the morning, and Flick in the afternoon. Sayers testified that Leonard had not seemed upset and that Flick had appeared happy. On cross-examination, Sayers stated that he had not seen Leonard and Flick together that day and admitted that he did not know how Leonard acted later that day.

{¶ 18} Rick Schoeny, a life-long friend of Leonard's, testified that Leonard always had guns and carried a gun in his jacket. Leonard's brother Ted testified that Leonard had sometimes threatened to kill people when he was upset. Ted noted, however, that this was "the way [Leonard] always voiced his opinion" and that these threats were never taken seriously.

{¶ 19} Other testimony indicated that Leonard and Flick had spent time together in the days leading up to the murder and had plans to go horseback

riding the following day. In his confession, Leonard claimed that he and Flick had begun to engage in consensual sex before he shot her. He also said that he "went blank" just before shooting her.

{¶ 20} Leonard also confessed to having shot at Flick's front door to keep Gries and Minges from entering the home. Evidence at trial indicated that Leonard had fired only one shot at the door.

{¶ 21} The jury convicted Leonard of the two aggravated-murder counts (Counts One and Two) and kidnapping (Count Six). The jury found Leonard not guilty of the two attempted-murder counts (Counts Three and Four) but guilty of the lesser included offense of felonious assault. Leonard was also found not guilty of rape (Count Five) but was found guilty of attempted rape.

{¶ 22} As to the capital specifications, the jury found Leonard guilty of committing murder during a rape or attempted rape. R.C. 2929.04(A)(7). He was found not guilty of the R.C. 2929.04(A)(5) course-of-conduct specification. Leonard was also found guilty of all gun specifications.

{¶ 23} After the penalty phase of the trial, the jury recommended death. Thereafter, the trial court sentenced Leonard to death, consecutive sentences of eight years each for his two felonious-assault convictions and his attempted rape conviction, and ten years for kidnapping. Three-year sentences were imposed for each of the gun charges. Because several of the firearm specifications merged, the prison term imposed for the noncapital offenses was 40 years.

{¶ 24} The matter is now before the court upon an appeal as of right.

## I. Pretrial Issues

### A. Failure to Fund or Appoint Defense Experts

{¶ 25} In his first proposition of law, Leonard alleges that a lack of funds prevented defense counsel from hiring an investigator, a coroner, a crime-scene investigator, and an expert on sexual abuse or rape. In his eighth proposition of law, Leonard claims that his death sentence must be reversed because a pathologist was not provided to assist trial counsel in either the guilt-determination or penalty phase.

{¶ 26} R.C. 2929.024 requires the trial court to grant funds in aggravated murder cases for investigative services and experts when "reasonably necessary for the proper representation" of indigent defendants. In *State v. Mason* (1998), 82 Ohio St.3d 144, 694 N.E.2d 932, syllabus, we held that due process "requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense and (2)

that denial of the requested expert assistance would result in an unfair trial. (*State v. Broom* [1988], 40 Ohio St.3d 277, 533 N.E.2d 682, approved and followed.)" See, also, *Ake v. Oklahoma* (1985), 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53.

{¶ 27} In this case, Leonard retained private counsel. Nevertheless, on the defense's motion, the trial court declared Leonard indigent and indicated before trial that it would consider any defense request for funds. However, Leonard did not request funding for any of the experts that he now claims were necessary to his defense. In fact, Leonard's trial counsel informed the court that defense experts were not necessary. We need not consider an error that a defendant neglected to bring to the trial court's attention. See *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. Thus, any error is cognizable only if it amounts to plain error. Crim.R. 52(B).

{¶ 28} Leonard offers only a conclusory argument that he was prejudiced by a lack of funds. In this case, however, the time, place, and cause of death are not in dispute, and Leonard does not explain how the failure to provide an investigator, a coroner, and a crime-scene investigator would have aided his defense. See, e.g., *State v. Nields* (2001), 93 Ohio St.3d 6, 12, 752 N.E.2d 859. While the defense did vigorously contest the rape charge, it is unclear what value a sexual-abuse or rape expert would have been to the defense. No semen was found at the crime scene, the coroner did not detect vaginal or anal trauma to Flick, and Leonard was found not guilty of rape.

{¶ 29} Moreover, we find that the evidence supported Leonard's attempted-rape conviction. Flick's body was found in her living room, partially nude and handcuffed. Leonard told police that he had begun to have sex with Flick before shooting her. Thus, Leonard has failed to show a particularized need for these experts or that the failure to employ defense experts denied him a fair trial. Cf. *State v. Mason*, 82 Ohio St.3d at 152, 694 N.E.2d 932; *State v. Clemons* (1998), 82 Ohio St.3d 438, 443, 696 N.E.2d 1009.

{¶ 30} Similarly, we conclude that Leonard has not established a particularized need for an independent pathologist, nor has he shown how the lack of such an expert hindered his defense. Leonard asserts that an independent pathologist was necessary to conduct an independent investigation and testing and to contest the "coroner's methodology and findings in regard to the cause, manner, and timing of death, especially the allegations of strangulation by the State." But the cause, manner, and time of death are not in dispute. Although defense counsel challenged the coroner's conclusion that Flick was strangled, strangulation was not the cause of death, and Leonard offers no explanation of how expert testimony on this issue would have aided his defense. See, e.g., *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 151, 749 N.E.2d 226. Moreover, the record indicates

that the coroner performed the autopsy in a competent and professional manner and thoroughly documented his findings. See, e.g., *State v. Nields*, 93 Ohio St.3d at 12, 752 N.E.2d 859. Because no error occurred, plain or otherwise, Leonard's first and eighth propositions of law are overruled.

### B. Voluntariness of Confession

{¶ 31} Leonard claims in proposition of law five that the trial court erred in failing to suppress his confession. Leonard contends that his waiver of his rights and his confession to police were not knowing, intelligent, and voluntary because, at the time, he was "suicidal, heartbroken, and exhausted."

{¶ 32} In determining whether a pretrial statement is voluntary, a court " 'should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' " *State v. Mason*, 82 Ohio St.3d at 154, 694 N.E.2d 932, quoting *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. The same considerations apply to whether a defendant voluntarily, knowingly, and intelligently waived his rights. *State v. Eley* (1996), 77 Ohio St.3d 174, 178–179, 672 N.E.2d 640; *State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844.

{¶ 33} After Leonard surrendered, Campbell County (Kentucky) officers advised him of his *Miranda* rights. Hamilton County detectives gave a second *Miranda* warning. Leonard waived his rights each time, and he signed a waiver-of-rights form. Leonard now asserts that the trial court erred in admitting his confession into evidence because his emotional instability affected his ability to make a valid waiver and a voluntary confession. Evidence introduced at the suppression hearing indicated that Leonard had killed Flick because he was heartbroken and exhausted and that he had contemplated killing himself after he shot her.

{¶ 34} However, a defendant's mental condition is only one factor in the totality of circumstances to be considered in determining voluntariness. A defendant's mental condition may be a "significant factor in the 'voluntariness' calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.' " (Citation omitted.) *Colorado v. Connelly* (1986), 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473. Issues of voluntariness have always turned on the presence or absence of police coercion or overreaching. Id. at 170, 107 S.Ct. 515, 93 L.Ed.2d 473. See, also, *State v. Eley*, 77 Ohio St.3d at 178, 672 N.E.2d 640.

{¶ 35} We have reviewed the suppression-hearing transcript and find no evidence suggesting that Leonard's "will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." See *State v. Otte* (1996), 74 Ohio St.3d 555, 562, 660 N.E.2d 711; *Colorado v. Connelly*, 479 U.S. at 167, 107 S.Ct. 515, 93 L.Ed.2d 473. No threats or inducements were made, and both Campbell County and Hamilton County police officers conducted themselves with professionalism. After he was taken into custody, Leonard was cooperative and calm. According to Sergeant Chaplin, Leonard's friend of eight years, Leonard "appeared normal, like nothing was bothering him."

{¶ 36} Although Leonard claimed that one of the reasons he had killed Flick was his lack of sleep, he did not appear to police to be tired. Cf., *State v. Tibbetts*, 92 Ohio St.3d at 154–155, 749 N.E.2d 226 (claim of grogginess from medication did not render defendant's statements involuntary). Leonard did not appear to be under the influence of alcohol or drugs. Hamilton County detectives interviewed Leonard for approximately one hour, and during questioning, Leonard was offered water and cigarettes.

{¶ 37} Based on the totality of the circumstances, we have determined that Leonard's confession was knowing, voluntary, and intelligent and was admissible. See *State v. Eley*, 77 Ohio St.3d at 178–179, 672 N.E.2d 640; *State v. Clark*, 38 Ohio St.3d at 261, 527 N.E.2d 844; *State v. Edwards*, 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. Therefore, we overrule Leonard's fifth proposition of law.

### C. Failure to Reduce Bail

{¶ 38} In his ninth proposition of law, Leonard argues that the trial court's failure to set reasonable bail infringed upon his constitutional right to assist counsel in preparing his defense. Leonard's argument is without merit.

{¶ 39} Leonard's bail was set at $2 million cash. Leonard asserts that the trial court erred in failing to hold an evidentiary hearing to determine whether a lower bail should be set. However, at arraignment, defense counsel stated that he did not wish to be heard on the bail issue. Thus, this issue has been waived. *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus; *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, at ¶ 34. Moreover, following conviction, " 'any error concerning the issue of pretrial bail is moot.' " Id. at ¶ 35, quoting *State v. Patterson* (1996), 110 Ohio App.3d 264, 271, 673 N.E.2d 1001. Leonard's ninth proposition of law is overruled.

### D. Grand–Jury Issues

{¶ 40} Leonard argues in proposition of law ten that he was indicted "by an improperly constituted grand jury and upon inadequately presented evidence." In proposition 24, Leonard argues that his constitutional rights were violated because the "process utilized in Hamilton County to select the foremen of grand juries that return capital indictments is biased geographically, racially, culturally, and socio-economically."

{¶ 41} Leonard failed to raise these issues in the trial court and has thus waived all but plain error. *State v. Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus; *State v. Joseph* (1995), 73 Ohio St.3d 450, 455, 653 N.E.2d 285; *State v. Taylor* (1997), 78 Ohio St.3d 15, 23, 676 N.E.2d 82. Leonard has failed to demonstrate plain error. Moreover, we rejected identical grand-jury arguments in *State v. Issa* (2001), 93 Ohio St.3d 49, 61–62, 752 N.E.2d 904, and *State v. Nields,* 93 Ohio St.3d at 18–20, 752 N.E.2d 859. Accordingly, we overrule Leonard's 10th and 24th propositions of law.

### E. Improper Indictment

{¶ 42} Leonard contends in his 17th proposition of law that the trial court erred by allowing him to be tried, convicted, and sentenced on an indictment that charged two separate death-penalty specifications in a single specification. Leonard claims that he was deprived of his right to a unanimous verdict because the jury did not specify whether he had been the principal offender in the aggravated murder or whether he had committed the aggravated murder with prior calculation and design. Leonard failed to object to this issue at trial and has waived all but plain error. Crim.R. 52(B). For the following reasons, we conclude that no error, plain or otherwise, occurred.

{¶ 43} First, Leonard is mistaken in stating that the indictment included specifications that charged that he had been the principal offender "and/or" that he had committed the murder with prior calculation and design. The specifications at issue (Specification Two to Counts One and Two) tracked the language of R.C. 2929.04(A)(7) and alleged that "either [Leonard] was the principal offender in the commission of the Aggravated Murder, or, if not the principal offender, committed the Aggravated Murder with prior calculation and design." Thus, there was no error because the elements of R.C. 2929.04(A)(7) were charged disjunctively. See *State v. Cook* (1992), 65 Ohio St.3d 516, 527, 605 N.E.2d 70.

{¶ 44} Second, prior to submitting the case to the jury, the trial court amended the indictment to delete the prior-calculation-and-design element. See Crim.R. 7(D). Thus, the jurors unanimously determined that Leonard was the principal offender.

{¶ 45} Finally, no evidence suggested another offender. See *State v. Chinn* (1999), 85 Ohio St.3d 548, 558, 709 N.E.2d 1166; *State v. Nields*, 93 Ohio St.3d at 30, 752 N.E.2d 859. Therefore, Leonard's 17th proposition of law is overruled.

### F. Prejudicial Publicity

{¶ 46} In proposition of law 11, Leonard argues that prejudicial publicity deprived him of his right to a fair trial and a fair and reliable sentencing determination. We reject Leonard's claim for several reasons.

{¶ 47} First, several months prior to trial, Leonard requested a change of venue. See Crim.R. 18(B); R.C. 2901.12(K). The trial court overruled the motion as premature but permitted Leonard to raise the issue again during jury selection. Leonard failed to raise the venue issue again and did not raise the prejudicial-publicity issue again in the trial court. As a result, Leonard waived this issue. See *State v. Campbell* (2000), 90 Ohio St.3d 320, 336, 738 N.E.2d 1178; *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus.

{¶ 48} Second, Leonard makes blanket assertions about extensive media coverage, but the record contains no specific evidence of adverse publicity. Thus, we need not consider his claims of prejudice. See *State v. Montgomery* (1991), 61 Ohio St.3d 410, 413, 575 N.E.2d 167; *State v. Nields*, 93 Ohio St.3d at 20, 752 N.E.2d 859.

{¶ 49} Third, nothing in the record of voir dire supports Leonard's argument that prejudicial publicity denied him a fair and impartial jury. The examination of jurors during voir dire affords the best test as to whether adverse publicity necessitates a change of venue. *State v. Swiger* (1966), 5 Ohio St.2d 151, 34 O.O.2d 270, 214 N.E.2d 417, paragraph one of the syllabus; *State v. Montgomery* at 413, 575 N.E.2d 167.

{¶ 50} During voir dire, several prospective jurors disclosed that they had been exposed to media coverage of the case. But all stated that they knew nothing specific about the crimes and would not be influenced by what they had heard. In fact, Leonard's trial counsel extensively questioned several of these prospective jurors but declined to challenge any for cause based on their media exposure.

{¶ 51} Finally, during voir dire and throughout the trial, the judge repeatedly admonished prospective and seated jurors to avoid exposure to information about the case outside the courtroom and to advise the court of any incidents of exposure. See *State v. Landrum* (1990), 53 Ohio St.3d 107, 117, 559 N.E.2d 710. No incidents were reported, and nothing in the record indicates that jurors did not follow the judge's instructions. Accordingly, we overrule proposition of law 11.

## G. Voir Dire

{¶ 52} Leonard argues in his 21st proposition of law that he was denied his right to a fair trial by an impartial and unbiased jury. Leonard contends that the trial court erred in failing to excuse two prospective jurors who indicated that they believed that death was the appropriate penalty in every murder case. See, generally, *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492. Leonard asserts that his trial counsel were forced to peremptorily challenge these "automatic death penalty jurors."

{¶ 53} A prospective juror in a capital case may be excused for cause if his views on capital punishment would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581. See, also, *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, death penalty vacated on other grounds (1985), 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452. A trial court's ruling on a challenge for cause will not be overturned on appeal "unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion." *State v. Williams* (1997), 79 Ohio St.3d 1, 8, 679 N.E.2d 646; accord *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 280 N.E.2d 915.

{¶ 54} Leonard claims that prospective jurors Gunther and Dubarry should have been dismissed for cause. Gunther strongly favored the death penalty in most murder cases, with very few exceptions. But Gunther accepted that, under Ohio law, the death penalty is not appropriate in all cases and agreed to put aside her views and follow the judge's instructions. When questioned by defense counsel, Gunther responded that if there is a purposeful killing, then the death penalty is deserved. Defense counsel then challenged Gunther for cause.

{¶ 55} The trial court individually questioned Gunther to clarify her views. When the trial judge asked if she would automatically vote for the death penalty after a guilty verdict, Gunther stated, "I cannot imagine any mitigating factors that would sway my decision [to impose the death penalty]." She also informed the court that she had previously served as a juror on a capital case in Hamilton County. When questioning continued, Gunther indicated that her death-penalty views would not substantially impair her ability to fairly and impartially listen to all the evidence and go through the sentencing-phase weighing process.

{¶ 56} Gunther then equivocated. In response to the question whether she would enter the weighing process "with preconceived ideas that the death penalty must be imposed," Gunther said, "I'm not sure [b]ecause I do feel pretty strongly about if you take somebody's life then the death penalty should be imposed." Yet, when asked if she could "assure" the court that she could "fairly and

impartially consider both the aggravating circumstances and the mitigating factors before reaching a determination * * * whether or not the death penalty would be an appropriate verdict," Gunther answered, "Yes."

{¶ 57} Gunther revealed a strong disposition toward imposing the death penalty. But she agreed to put aside her views and follow the judge's instructions. She also assured the court that she could fairly and impartially weigh the mitigation evidence before deciding on the appropriate penalty. Even when a juror shows a predisposition in favor of imposing the death penalty, the trial court does not abuse its discretion in denying a challenge for cause if the juror states that she will follow the law and the court's instructions. *State v. Mack* (1995), 73 Ohio St.3d 502, 510, 653 N.E.2d 329; *State v. Treesh* (2001), 90 Ohio St.3d 460, 468, 739 N.E.2d 749.

{¶ 58} Here, the trial judge obviously believed Gunther when she said that she would follow the law and put aside her views on the death penalty. Deference must be paid to the trial judge, who sees and hears the juror. *Wainwright v. Witt*, 469 U.S. at 425–426, 105 S.Ct. 844, 83 L.Ed.2d 841; *State v. Williams*, 79 Ohio St.3d at 8, 679 N.E.2d 646.

{¶ 59} Prospective juror Dubarry also strongly favored capital punishment. But he believed he could put aside those views and be fair and impartial. Dubarry, however, voiced concern in voting for a life sentence without the possibility of parole, calling this sentence "almost too severe." Upon further questioning, Dubarry responded that his views would not substantially impair his ability to fairly consider all sentencing options. The trial judge denied a challenge for cause.

{¶ 60} Dubarry agreed to follow the court's instructions and stated that his views would not interfere with his duties as a juror. Under these circumstances, the trial court did not abuse its discretion in refusing to excuse Dubarry for cause. See *State v. Williams*, 79 Ohio St.3d at 9, 679 N.E.2d 646.

{¶ 61} Moreover, the jury's composition was not affected by the trial court's decision not to remove Dubarry. After 12 jurors had been seated, Leonard exercised a peremptory challenge to exclude Dubarry as an *alternate* juror. Because no alternate jurors participated in the verdict, Leonard cannot claim that he wasted a peremptory challenge on Dubarry that he could have used to remove a venireman who sat on the jury. Thus, no prejudice could have resulted. See *State v. Tyler* (1990), 50 Ohio St.3d 24, 31–32, 553 N.E.2d 576.

{¶ 62} Leonard also raises several other issues under proposition of law 21. Leonard argues that the trial court placed unreasonable limitations on defense counsel during voir dire. The record does not support Leonard's claims.

{¶ 63} "The manner in which voir dire is to be conducted lies within the sound discretion of the trial judge." *State v. Lorraine* (1993), 66 Ohio St.3d 414, 418, 613 N.E.2d 212. The trial court granted Leonard's counsel extensive leeway to question prospective jurors. Although the court attempted to keep voir dire moving, counsel were rarely limited in questioning potential jurors. The trial court allowed counsel to individually question all prospective jurors regarding their views on capital punishment and further permitted counsel to address other issues that arose during individual questioning.

{¶ 64} Leonard complains that the trial court would not allow his counsel to use hypothetical questions to determine a juror's death-penalty position. The trial court did admonish defense counsel's use of a hypothetical question in one instance. Leonard's counsel asked a prospective juror who was adamantly opposed to capital punishment whether he could impose the death sentence in a case like Timothy McVeigh's.

{¶ 65} We determine that the trial court did not err in precluding this question. A trial court has " 'great latitude in deciding what questions should be asked on voir dire.' " *State v. Wilson* (1996), 74 Ohio St.3d 381, 386, 659 N.E.2d 292, quoting *Mu'Min v. Virginia* (1991), 500 U.S. 415, 424, 111 S.Ct. 1899, 114 L.Ed.2d 493. Moreover, "[a]lthough R.C. 2945.27 affords the prosecution and defense the opportunity to conduct a reasonable examination of prospective jurors, * * * the trial court reserves the right and responsibility to control the proceedings of a criminal trial pursuant to R.C. 2945.03, and must limit the trial to relevant and material matters with a view toward the expeditious and effective ascertainment of truth." *State v. Durr* (1991), 58 Ohio St.3d 86, 89, 568 N.E.2d 674. A review of the voir dire reveals that Leonard's counsel were permitted to thoroughly explore prospective jurors' views. Leonard has not shown that the trial court unreasonably or arbitrarily restricted counsel's examination.

{¶ 66} The trial court also denied defense counsel's request for sequestered voir dire. But " '[t]here is no requirement that voir dire in a capital case must be conducted in sequestration.' " *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 96, quoting *State v. Fears* (1999), 86 Ohio St.3d 329, 338, 715 N.E.2d 136. The trial court did permit counsel to individually question prospective jurors. And although prospective jurors were not sequestered, the trial court gave all jurors the opportunity to be questioned in private if they were uncomfortable discussing their views in a group setting. We find that there was no error in not allowing sequestered voir dire.

{¶ 67} Leonard's remaining arguments under this proposition are also without merit. Leonard contends that during voir dire, the trial court "improperly commented upon the effect of convicting Leonard of the aggravating factors." Leonard failed to object during trial and waived all but plain error. Crim.R.

52(B). Moreover, we have reviewed the transcript and find that the trial court's comments were not improper; they merely outlined the proper procedures employed during a capital trial.

{¶ 68} Similarly, we conclude that no error occurred when the trial court failed to inform prospective jurors during voir dire that "parole eligibility is determined after [Leonard] serves a full sentence, that is to say, no good time credit." Further, contrary to Leonard's contention, the trial court did not err when it referred to aggravating "circumstances," as opposed to "factors." The trial court's reference to "circumstances" tracks the language in R.C. 2929.04. We also reject Leonard's claim regarding the juror questionnaire. Leonard has not shown how the questionnaire was flawed, nor has he identified which questions he claims were prejudicial.

{¶ 69} Finally, Leonard claims ineffective assistance of counsel occurred during voir dire. We will address this claim under proposition of law four. Based on the foregoing, we overrule Leonard's 21st proposition of law.

{¶ 70} In proposition of law 22, Leonard contends that the trial court improperly excused for cause prospective jurors Gooding, Dignan, Ison, and Crockett. Leonard's assertions lack merit.

{¶ 71} Prospective juror Gooding initially stated that she could follow the court's instructions and the law and consider imposing the death penalty. But Gooding later stated, "I'm not against [the death penalty] but personally I don't think I could make that decision. * * * I personally could not decide someone's fate, if they are going to live or die." When questioned further, Gooding agreed that her views would substantially impair the performance of her duties as a juror. Leonard's counsel and the trial court attempted to rehabilitate her. Gooding, however, reiterated that she could not consider imposing a death sentence.

{¶ 72} Prospective juror Dignan also stated that she could consider imposing a death sentence. Dignan later said, "I feel that it's not a right that we have to deliberately take the life of another * * * [e]xcept in self-defense." When asked if she could ever impose the death penalty, she could not answer yes or no but said she "would find it very difficult." Dignan then stated that her views against capital punishment were strongly held and that she is opposed to it in all cases, including this case. Finally, she agreed that she would not be able to sign a verdict imposing the death sentence. After defense counsel tried to rehabilitate her, Dignan declared that "there are no circumstances" in which she could impose a death sentence.

{¶ 73} Prospective juror Ison also initially declared that she could consider imposing a death sentence. After further questioning, she stated that she is not against the death penalty, but she "didn't feel comfortable being the one to do it."

Ison later reiterated, "I just don't want to be the one to do it. Now, if I could, say, sentence him to life in jail, maybe yes. But to say give him the chair, I don't want to do that." Ison equivocated when the trial court questioned her, but she ultimately decided that she did not believe she could sign a death verdict.

{¶ 74} Prospective juror Crockett said that she did not think that the death penalty was appropriate in any case but that she could consider imposing a death sentence "because that's the law that we live by in America." Crockett admitted that her views could prevent or substantially impair her ability to be fair and impartial. When defense counsel questioned Crockett, she stated, "I believe [I could consider imposing a death sentence]. But I can't 100 percent say that in the back of my mind that my views wouldn't allow that." Crockett could not assure the court that her beliefs would not impair her ability to serve as a juror and finally told the trial judge, "I guess, in all honesty, I don't think I could" sign a death verdict.

{¶ 75} We find that the trial court did not abuse its discretion by excusing these four prospective jurors. The record reflects that their views on the death penalty would have prevented or substantially impaired their ability to serve as fair and impartial jurors. See, e.g., *State v. Dunlap* (1995), 73 Ohio St.3d 308, 315, 652 N.E.2d 988; *State v. Rogers,* 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus. Therefore, Leonard's 22nd proposition of law is overruled.

## II.   Guilt–Determination–Phase Issues

### A.   Sufficiency/Manifest Weight of Evidence

{¶ 76} In his sixth proposition of law, Leonard claims that the evidence was insufficient to support his aggravated-murder convictions. We disagree.

{¶ 77} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 78} Leonard was convicted of two counts of aggravated murder: purposely causing the death of Flick while committing, attempting to commit, or fleeing immediately after committing or attempting to commit rape, and the purposeful killing of Flick with prior calculation and design. See R.C. 2903.01(B) and (A).

{¶ 79} We conclude that sufficient evidence was introduced at trial to support these convictions. On the night of the murder, Leonard twice followed and stopped Flick in her car. After stopping her car the second time, Leonard ordered Flick to return to her house. Leonard followed Flick to her home, where

he handcuffed her and held her at gunpoint. Leonard confessed to firing three shots into Flick's head from close range. Leonard also told police that just before he shot Flick, he had been on top of her with his pants down because they had "decided to [have sexual intercourse] on the floor."

{¶ 80} Although Leonard's confession suggests that Flick had consented, there was substantial evidence of forcible sexual conduct, and a rational trier of fact could find Leonard guilty of attempted rape. See, e.g., *State v. Williams* (1996), 74 Ohio St.3d 569, 576, 660 N.E.2d 724; *State v. Scudder* (1994), 71 Ohio St.3d 263, 274–275, 643 N.E.2d 524. But cf. *State v. Davis* (1996), 76 Ohio St.3d 107, 114–115, 666 N.E.2d 1099 (holding that evidence that victim's body was found naked, that victim had been seen pushing the defendant away before she was shot, and that there were possible finger marks on one of the victim's thighs was insufficient evidence to support attempted-rape conviction). Police found Flick's body lying in a pool of blood on her living room floor, partially nude. She had been shot three times in the head, her panties had been pulled down to her thighs, one pant leg had been pulled off, the other had been pulled down to her calf, and one shoe had been removed. Her hands were bound by handcuffs, and bruising on her wrists indicated that she had struggled while handcuffed. Marks on her neck and petechiae on her face indicated that she had been strangled.

{¶ 81} Leonard also contends under this proposition that his aggravated murder convictions are contrary to the manifest weight of the evidence. The question to be answered when a manifest-weight issue is raised is whether "there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt." (Emphasis sic.) *State v. Getsy* (1998), 84 Ohio St.3d 180, 193–194, 702 N.E.2d 866, citing *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 82} At trial, defense counsel conceded that Leonard had killed Flick but argued that the state had failed to prove that Leonard was guilty of *aggravated* murder under R.C. 2903.01. Specifically, counsel maintained that the state had not proven rape or attempted rape under R.C. 2903.01(B) or prior calculation and design under section (A).

{¶ 83} This is not, however, the " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin,* 20 Ohio App.3d at 175, 20 OBR 215, 485 N.E.2d 717.

Substantial evidence existed to support convictions on both counts of aggravated murder. Therefore, Leonard's sixth proposition of law lacks merit and is overruled.

## B. Gruesome Photographs

{¶ 84} In the 12th proposition of law, Leonard contends that the trial court erred by admitting into evidence gruesome and cumulative photographs of the victim. Leonard's pretrial motion in limine to preclude admission of photographs of the victim was overruled, as were counsel's objections at trial.

{¶ 85} In capital cases, nonrepetitive photographs, even if gruesome, are admissible as long as the probative value of each photograph outweighs the danger of material prejudice to the accused. *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267. Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916.

{¶ 86} Leonard challenges the admission of five crime-scene photographs. These photos illustrated the testimony of the police officers who discovered Flick's body and illustrated the crime scene and the body's condition. See, e.g., *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, at ¶ 72.

{¶ 87} None of these photos is duplicative or cumulative. Each depicts a different view or angle of the victim's body and her injuries. State's Exhibit 1–E is a partial view of Flick's body as first seen by police looking through a window from outside her house. State's Exhibit 1–I shows a full view of Flick's body and depicts how the body was positioned in the home. State's Exhibit 1–J shows Flick with her panties at midthigh, with one pant leg down around her calf and the other pant leg completely off. State's Exhibit 1–K depicts bruising on her thighs. State's Exhibit 1–L shows that Flick was handcuffed. These photos, although gruesome, were probative of issues of intent, premeditation, and the manner and circumstances of Flick's death, including whether Leonard had attempted to rape her. We determine that the probative value outweighed the danger of unfair prejudice. See, e.g., *State v. Biros* (1997), 78 Ohio St.3d 426, 444–445, 678 N.E.2d 891.

{¶ 88} Leonard also objected to 11 autopsy photographs, claiming that they are gruesome and repetitive. Autopsy photos serve a purpose different from the crime-scene photographs. See *State v. Reynolds* (1998), 80 Ohio St.3d 670, 676–677, 687 N.E.2d 1358. Two photos showed the three gunshot wounds to the head from different angles. These photos illustrated the coroner's testimony and helped show Leonard's intent. The coroner also used autopsy photos in his testimony to explain injuries to Flick's neck and wrists. State's Exhibits 20–K, J,

and I are different angles of Flick's right hand and wrist, portraying bruising that corresponds to the handcuffs that had been on her wrists. State's Exhibit 20–H portrays similar bruising to the left wrist. State's Exhibit 20–G depicts Flick's face and shows petechiae, small reddish marks indicating ruptured blood vessels that are caused by compression to the neck. State's Exhibit 20–D demonstrates ligature bruising on the neck caused by Flick's necklace. This photo also shows more petechiae around the neck and stippling, an injury to the skin caused by unburned particles of gunpowder. State's Exhibit 20–B is a close-up of the ligature mark on the neck. These photos supported the coroner's conclusions that Flick had been strangled and had struggled while handcuffed. Finally, State's Exhibit 20–E demonstrates a gunshot injury to Flick's left index finger, and 20–F shows a gunshot wound to the lower lip and also illustrates stippling. None of the autopsy photos were duplicative or cumulative, and the value of each photo outweighed any prejudicial impact. Thus, we conclude that no abuse of discretion occurred in admitting the photos.

{¶ 89} Leonard also complains that photos of the victim were displayed on a "big screen television." During the state's case, photos of Flick were on a screen, but the record does not indicate what size screen was used. Moreover, Leonard did not object to displaying the photos on screen. Nothing in the record demonstrates that the method of presenting this evidence prejudiced Leonard by inflaming the jury's passions. See, e.g., *State v. Biros,* 78 Ohio St.3d at 444–445, 678 N.E.2d 891. See, also, *State v. Gumm* (1995) 73 Ohio St.3d 413, 425, 653 N.E.2d 253 (the size of a photo alone does not increase the prejudicial aspect of the evidence to the extent that it becomes inadmissible). Thus, no plain error occurred.

{¶ 90} Finally, Leonard objects to the prosecutor's use of photographs during closing argument. It appears that the prosecutors referred to the photographs only twice in their closing arguments, and Leonard failed to object both times. Again, we find there was no plain error. Accordingly, we overrule proposition of law 12.

### C. Hearsay

{¶ 91} In his 23rd proposition of law, Leonard argues that the admission of several hearsay statements violated his right to confront his accuser and denied him a fair trial.

{¶ 92} Leonard first claims that Ryan Gries was allowed to testify that on the night of the murder Flick had said she was going to Gries's house to play pool. But the trial court sustained an objection and precluded any testimony from Gries as to what Flick had said in this regard. Further, any testimony from Gries that Flick had intended to go to his house that night would have been merely cumulative of evidence in Leonard's confession.

{¶ 93} Leonard also challenges Gries's testimony regarding his telephone conversation with Flick the night she was killed. Over objection, the trial court admitted testimony from Gries that Flick had told him on the telephone that she was not coming to his house. According to Gries, Flick kept repeating that she was "not coming down tonight." Gries eventually was able to elicit from Flick, through her responses to his questions, that Leonard was at her house and was hurting her.

{¶ 94} Flick's statements to Gries were admissible under the excited-utterance exception of Evid.R. 803(2), which allows a hearsay statement to be admitted into evidence if it relates "to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." According to Leonard's confession, when Flick was on the phone with Gries, Leonard had a gun pointed at her. Further, Gries testified that during their phone conversation, Flick was very upset, she was crying, and she had a tremendous amount of fear in her voice. The evidence thus reflects that Flick's statements were made while she was in fear and under the stress of a startling event. See, e.g., *State v. O'Neal* (2000), 87 Ohio St.3d 402, 410–411, 721 N.E.2d 73.

{¶ 95} Moreover, the fact that Flick's statements were made in response to Gries's questions does not preclude their admission as an excited utterance. "The admission of a declaration as an excited utterance is not precluded by questioning which: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties." *State v. Wallace* (1988), 37 Ohio St.3d 87, 524 N.E.2d 466, paragraph two of the syllabus.

{¶ 96} Gries's questions were not coercive or leading. Gries asked simple, straightforward questions: "[W]hat happened?" "What's the matter?" When Flick repeatedly responded, "I'm not coming down tonight," Gries asked, "Is [Leonard] there? * * * Is he beating you?" The questions were not designed to elicit a particular response or to obtain information that Flick tried to withhold. Gries's inquiries merely facilitated Flick's expressions. Certainly, under these circumstances, Flick's statements were made while she was under the stress of excitement of Leonard's pointing a gun at her and were not the product of reflective thought.

{¶ 97} Leonard additionally claims that the trial court improperly allowed Gries's testimony that during the same phone call, Flick had told Gries not to come to her house and not to call the police. According to Gries's testimony, Flick responded negatively when Gries told her to call the police and when he said that he was going to come to her house. But these responses do not fall within the definition of hearsay, because they are not assertions. See Evid.R.

801(A) (defining a hearsay "statement" as "an oral or written *assertion.*" Emphasis added). "An 'assertion' for hearsay purposes 'simply means *to say that something is so, e.g.,* that an event happened or that a condition existed.' (Emphasis *sic.*)" *State v. Carter* (1995), 72 Ohio St.3d 545, 549, 651 N.E.2d 965, quoting 2 McCormick on Evidence (4th Ed.1992) 98, Section 246. The communication challenged by Leonard is not an assertion, because it cannot be proved true or false. Thus, it is incapable of being offered to prove the truth of the matter asserted, and, as such, the expression falls outside the definition of hearsay pursuant to Evid.R. 801(C). See, e.g., *State v. Young* (May 16, 2001), Cuyahoga App. No. 78058, 2001 WL 370460.

{¶ 98} Leonard also argues that Flick's statement that Leonard had forced her car off the road was inadmissible hearsay. On the night of her murder, Flick had planned to meet friends at Snow's Lake Bar. Leonard followed Flick as she headed for Snow's and, as he claims in his confession, "got her to pull over." Three witnesses, Alvie Woods, Deborah Schroeder, and Reva Ketterer, testified that when Flick arrived at Snow's, she told them that Leonard had just run her car off the road. Based on the following, Flick's statement was admissible as an excited utterance.

{¶ 99} For an excited utterance to be admissible, "[t]he central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may *not* be the result of reflective thought." (Emphasis sic.) *State v. Taylor* (1993), 66 Ohio St.3d 295, 303, 612 N.E.2d 316. The evidence indicated that Flick lived five to ten miles from Snow's and that during her drive, Leonard stopped her car. When Flick first arrived at Snow's, she was "upset," "scared," "very shaken," and "anxious." Ketterer and Schroeder both testified that upon entering Snow's, Flick immediately stated: "That son of a bitch [Leonard] ran me off the road." Flick's statement was not the result of reflective thought and was made under the stress of excitement caused by Leonard's having just forced her car from the road. See, e.g., *State v. Huertas* (1990), 51 Ohio St.3d 22, 31, 553 N.E.2d 1058 (affirming finding that a statement made 45 minutes after event but while the declarant was still agitated and in serious pain and had not calmed down to be an excited utterance).

{¶ 100} Leonard further complains of hearsay elicited through the testimony of Sabrina Frye. Leonard first complains of Frye's testimony that four days before the murder, Flick had said she intended to end her relationship with Leonard because he had fathered a second child by Penny McBride. But Frye's testimony was admissible as a statement of Flick's then existing mental condition. Evid.R. 803(3) allows for introduction of a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." This testimony

was probative of Flick's intent to end her relationship with Leonard. See, e.g., *State v. Tibbetts*, 92 Ohio St.3d at 158–159, 749 N.E.2d 226.

{¶ 101} However, the state-of-mind exception does not permit witnesses to relate why the declarant held a particular state of mind. See *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 21, 514 N.E.2d 394, citing *United States v. Cohen* (C.A.5, 1980), 631 F.2d 1223, 1225. Therefore, Frye's testimony regarding Flick's statement as to why she intended to end the relationship was inadmissible.

{¶ 102} Nevertheless, any error was harmless. Leonard stipulated at trial that he had fathered two children by McBride. In his confession, he stated that he had believed that his relationship with Flick was ending and that he had shot Flick because she had broken his heart.

{¶ 103} Leonard also argues that the trial court erred in admitting hearsay testimony from Frye regarding statements Leonard allegedly had made to Flick during conversations to which Frye was not a party. Specifically, Frye testified that Flick had told her that Leonard had said that if he could not have her, no one else could; and that if he ever saw Flick with another man, Leonard would kill him. Defense counsel's objection was overruled.

{¶ 104} We conclude that the trial court should have sustained counsel's objection because Frye's testimony was inadmissible hearsay. The testimony was not admissible under Evid.R. 803(3), because it did not reflect Flick's then existing state of mind. Instead, Frye merely restated a threat that Leonard had allegedly made to Flick. Even if it were admitted to show Flick's state of mind (e.g., that she was afraid of Leonard), Frye's testimony goes beyond the scope of the exception because it encompasses the underlying basis for Flick's mental state. See *State v. Awkal* (1996), 76 Ohio St.3d 324, 330–331, 667 N.E.2d 960, citing *State v. Apanovitch*, 33 Ohio St.3d at 21–22, 514 N.E.2d 394. Thus, the trial court erred in admitting this testimony.

{¶ 105} However, we conclude that the error was harmless. Leonard had told Alvie Woods the same thing directly that he had allegedly told Flick, and during Woods's testimony, the trial court properly admitted the statement under Evid.R. 801(D)(2)(a) (a statement is not hearsay if it is offered against a party and is the party's own statement). Therefore, this evidence was cumulative. See, e.g., *State v. O'Neal*, 87 Ohio St.3d at 411, 721 N.E.2d 73.

{¶ 106} Finally, we find that Frye's testimony regarding Flick's statement explaining why she had permitted Leonard to stay at her house the night before the murder was inadmissible. Frye testified that Flick had said that she had allowed Leonard to spend the night because Leonard "had continued to call and harass her and she was afraid that he would hurt himself." Defense counsel objected, but the trial court admitted the testimony under Evid.R. 803(3).

{¶ 107} Evidence may be admitted under Evid.R. 803(3) when it concerns the declarant's present state of mind or to show that the declarant subsequently acted in accordance with that state of mind. 2 Giannelli & Snyder, Evidence (2d Ed.2001) 102, Section 803.17. However, Evid.R. 803(3) excludes a statement of "memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

{¶ 108} According to Frye's testimony, Flick made this statement to Frye on Friday, July 28, 2000. It concerned an event—Leonard's spending the night at Flick's house—that took place the previous evening. Statements under Evid.R. 803(3) "must point towards the future rather than the past." *State v. Apanovitch*, 33 Ohio St.3d at 21, 514 N.E.2d 394. See, also, *Shepard v. United States* (1933), 290 U.S. 96, 105–106, 54 S.Ct. 22, 78 L.Ed. 196 (hearsay statements that relate past events are not admissible under the state-of-mind exception); Weissenberger, Ohio Evidence (2004) 463, Section 803.30 ("Where the statement does not pertain to a 'then existing' condition, it must be viewed as a narrative account of a past event formulated after time for reflection, and it is not admissible under Rule 803[3]"). Because Flick's statement related to past conduct, it does not fall within the state-of-mind exception under Evid.R. 803(3). But the error of admitting the testimony was harmless. Leonard confessed to the murder, and there was substantial evidence to support his attempted-rape conviction beyond a reasonable doubt. See, e.g., *State v. Steffen* (1987), 31 Ohio St.3d 111, 120, 31 OBR 273, 509 N.E.2d 383. Based on the foregoing, we overrule Leonard's 23rd proposition of law.

## D.   Admission of Police Reports

{¶ 109} Leonard argues in proposition of law 30 that his Confrontation Clause rights were violated by the admission of two police investigative reports. After police had taken Leonard into custody, Leonard confessed to Flick's murder during an interview with Hamilton County Sheriff's Detectives Schweinefus and Diersing. The following day, Schweinefus prepared a written investigation report summarizing Leonard's tape-recorded confession. Approximately five months later, Schweinefus prepared a supplemental report that purported to summarize other, unrecorded statements that Leonard had made during the interview. Over defense's objection, the trial court admitted both police reports into evidence. Schweinefus's original report was admitted in redacted form, so that only the detective's summary of Leonard's statements could be seen, and his supplemental report was admitted in its entirety. The trial court also permitted Schweinefus, over objection, to rely extensively on his reports while testifying on direct examination.

{¶ 110} Leonard's claim that the trial court admitted these police reports in violation of his right of confrontation is without merit. Both the Sixth Amend-

ment Confrontation Clause, and Section 10, Article I of the Ohio Constitution guarantee a criminal defendant the right to cross-examine witnesses who testify against him. See, e.g., *State v. Self* (1990), 56 Ohio St.3d 73, 78, 564 N.E.2d 446, citing *Henderson v. Maxwell* (1964), 176 Ohio St. 187, 188, 27 O.O.2d 59, 198 N.E.2d 456. Schweinefus's testimony on direct examination essentially mirrored the contents of his investigative reports. Leonard's counsel extensively and effectively cross-examined Schweinefus regarding the reports. The admission of hearsay does not violate the Confrontation Clause if the declarant (here, Schweinefus) testifies at trial. See *California v. Green* (1970), 399 U.S. 149, 157–158, 90 S.Ct. 1930, 26 L.Ed.2d 489; *State v. Keenan* (1998), 81 Ohio St.3d 133, 142, 689 N.E.2d 929. Thus, the trial court did not violate Leonard's constitutional right of confrontation.

{¶ 111} Nevertheless, we find that the trial court erred in admitting the reports. The police reports are inadmissible hearsay and should not have been submitted to the jury. In criminal cases, Evid.R. 803(8)(b) excludes from the public-records-and-reports exception to hearsay police reports that "recite an officer's observations of criminal activities or observations made as part of an investigation of criminal activities." *State v. Ward* (1984), 15 Ohio St.3d 355, 358, 15 OBR 477, 474 N.E.2d 300. These investigative reports recite Detective Schweinefus's observations made during his investigation into Leonard's criminal activity. The trial court also erred in allowing Schweinefus to rely on his reports during direct examination because the prosecutor failed to first establish that the reports were necessary to refresh the detective's recollection. However, for the following reasons, these errors were harmless. Crim.R. 52(A).

{¶ 112} First, the Rules of Evidence permitted Schweinefus to testify at trial as to matters contained in his investigative reports. In these reports, Schweinefus purported to have summarized statements, both recorded and unrecorded, that Leonard had made during his confession. A defendant's own out-of-court statements, offered against him at trial, are not hearsay. Evid.R. 801(D)(2)(a). Thus, while the investigative reports were inadmissible hearsay, the trial court properly admitted Schweinefus's in-court testimony regarding statements that Leonard had made.

{¶ 113} In *State v. Jackson* (1991), 57 Ohio St.3d 29, 565 N.E.2d 549, we found harmless error under almost identical circumstances. In *Jackson*, the trial court allowed into evidence a police officer's written summary of statements that the defendant had made during a police interview. The trial court also let the officer read his written summary to the jury, even though the prosecutor did not first establish, as required by Evid.R. 803(5), that the officer's recollection prevented him from testifying fully and accurately. We held that any error was harmless because the defendant's statements made during his police interview were

admissible under Evid.R. 801(D)(2)(a) through the police officer's testimony and no prejudice arose from the officer's recitation of his written summary. *Jackson,* 57 Ohio St.3d at 37, 565 N.E.2d 549.

{¶ 114} Second, the jury's verdict undercuts Leonard's assertion that he was prejudiced by the admission of the reports. The state's primary purpose in offering these investigative reports was to provide conclusive evidence (i.e., evidence of sexual penetration) that Leonard had raped Flick before killing her. See R.C. 2907.02 and 2907.01(A). But the jury acquitted Leonard of rape. Thus, the record does not support Leonard's contention that the jury placed undue weight on the reports. Based on the foregoing, we overrule proposition of law 30.

### E. Guilt–Determination–Phase Jury Instructions

{¶ 115} Leonard contends in proposition of law 25 that the trial court committed numerous errors in instructing the jury during the guilt-determination phase. Leonard first argues that the trial court improperly included an instruction on attempted rape. He also contends that the trial court "expanded the definition of the term 'attempt' from the definition listed in Ohio Revised Code § 2923.01(A) [sic, 2923.02]." Defense counsel objected to both instructions. However, we find that no error occurred.

{¶ 116} Attempted rape is a lesser included offense of rape, and the evidence at trial supported the trial court's decision to instruct on that offense. See *State v. Williams,* 74 Ohio St.3d at 578, 660 N.E.2d 724. See, also, *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. Also, the trial court did not erroneously expand the definition of "attempt" set forth in R.C. 2923.02. The trial court's definition substantially conformed to the definition of "attempt" set forth in *State v. Green* (1991), 58 Ohio St.3d 239, 240, 569 N.E.2d 1038. See, also, *State v. Woods* (1976), 48 Ohio St.2d 127, 2 O.O.3d 289, 357 N.E.2d 1059, paragraph one of the syllabus (construing R.C. 2923.02[A] ), which was cited with approval in *Green.*

{¶ 117} Leonard next challenges the trial court's instruction on reasonable doubt. The reasonable-doubt instruction in the guilt-determination phase was in accord with R.C. 2901.05(D), and we have previously rejected complaints against the statutory definition. See, e.g., *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 232, 594 N.E.2d 604; *State v. Getsy,* 84 Ohio St.3d at 202, 702 N.E.2d 866.

{¶ 118} Leonard also argues that the trial court erred in its instructions on causation and prior calculation and design, but Leonard failed to object to these instructions at trial. No error, plain or otherwise, occurred. See *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 97–99 (in which a substantially identical causation instruction was upheld); *State v. Jones* (2001), 91

Ohio St.3d 335, 348, 744 N.E.2d 1163 (in which a similar prior-calculation-and-design instruction was upheld).

{¶ 119} Leonard's claim that the trial court instructed the jury "on making an inference based on an inference" is not supported by the record. He also asserts that the trial court's instruction that "a good motive is not a defense" negated the court's instruction on purpose. But the trial court instructed the jury that while proof of motive is not required, "[t]he presence or absence of motive is one of the circumstances bearing upon purpose." A single jury instruction may not be judged in artificial isolation but must be viewed in the context of the overall charge. *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. Leonard failed to object to the trial court's "good motive" instruction, and plain error has not been shown. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

{¶ 120} We also reject Leonard's argument that the trial court's "purpose" instruction, which is a standard instruction, created a mandatory rebuttable presumption. See *State v. Phillips* (1995), 74 Ohio St.3d 72, 100, 656 N.E.2d 643; *State v. Wilson*, 74 Ohio St.3d at 392, 659 N.E.2d 292.

{¶ 121} Finally, Leonard asserts that the jury was instructed during the guilt-determination phase "as to how they would reach the mitigation phase of the case," but he does not explain how he was prejudiced. To the extent that Leonard contends that the trial court improperly injected the issue of punishment into the guilt-determination phase, we rejected similar arguments in *State v. Phillips*, 74 Ohio St.3d at 100–101, 656 N.E.2d 643, and *State v. Durr*, 58 Ohio St.3d at 90, 568 N.E.2d 674. Cf. R.C. 2929.03(B) ("The instruction to the jury shall * * * not mention the penalty that may be the consequence of a guilty or not guilty verdict on any charge or specification"). Accordingly, Leonard's 25th proposition of law is overruled.

### F. Reading Back of Portions of Witness Testimony

{¶ 122} In his 31st proposition of law, Leonard claims that the trial court erred when it allowed portions of testimony to be read to the jury. After beginning deliberations, the jury requested that the testimony of Kelly Fenech and Alvie Woods be read. The trial court, over defense counsel's objection, said to the jury, "I'm going to ask you all to go back into the jury room and to discuss whether you could be more specific in your request as to what portions of the testimony you are looking for. We do have the testimony available. And if you want to hear the whole thing, I could provide that." The jury responded by requesting that the testimony of Fenech "describing her driving by the flower shop on July 28, 2000," and the testimony "of Alvie Woods concerning all conversations and interactions" with Leonard on July 28, 2000, be read. Thereafter, the trial court had those portions of testimony read to the jury.

{¶ 123} It is well settled that a trial court, upon a request from the jury, "may cause to be read all or part of the testimony of any witness." *State v. Berry* (1971), 25 Ohio St.2d 255, 54 O.O.2d 374, 267 N.E.2d 775, paragraph four of the syllabus. Moreover, the trial court has broad discretion in this regard. Id. See, also, *State v. Carter* (1995), 72 Ohio St.3d 545, 560, 651 N.E.2d 965; *State v. Davis* (1991), 62 Ohio St.3d 326, 340, 581 N.E.2d 1362. Leonard has failed to show that the trial court abused its discretion and offers a purely speculative claim of prejudice. Moreover, no abuse of discretion is apparent from the record. Therefore, we overrule Leonard's 31st proposition of law.

## G. Changing of Verdict Forms

{¶ 124} Leonard argues in proposition of law 32 that he was denied a fair trial when the trial court asked the jurors to submit a corrected verdict form in relation to the charge in Count Five. For the following reasons, we conclude that the trial court did not abuse its discretion.

{¶ 125} At the end of the guilt-determination phase, the jury found Leonard not guilty of the charge of rape in Count Five but guilty of the lesser included offense of attempted rape. During the penalty phase, the trial court learned that the verdict form signed by the jury contained a reference to R.C. 2907.05, the code section for gross sexual imposition, instead of the section numbers for attempt, R.C. 2923.02, and rape, R.C. 2907.02. The remaining language of the verdict form accurately reflected the jury's guilty verdict on the charge of attempted rape.

{¶ 126} To correct the error, the trial judge explained the error to the jury and provided the jury with a corrected verdict form, along with the other verdict forms for Count Five, and asked the jury to choose and complete the appropriate form. At defense counsel's request, the corrected form was not submitted to the jury until after it had returned its sentencing verdict. The jurors thereafter completed and signed the corrected verdict form.

{¶ 127} An analogous situation occurred in *State v. Davie* (1997), 80 Ohio St.3d 311, 686 N.E.2d 245, in which the verdict form for aggravated robbery inadvertently contained the word "kidnapping." The trial court in that case granted the state's motion to amend the verdict forms. Although we did not find prejudicial error in *Davie*, we noted that "[t]he better practice * * * would have been for the trial court to reconvene the jury to redeliberate" on the count at issue. Id. at 326, 686 N.E.2d 245.

{¶ 128} In the instant matter, the trial court followed the exact procedure set forth in *Davie*. See, also, *State v. Maurer*, 15 Ohio St.3d at 249, 15 OBR 379, 473 N.E.2d 768, citing *Hurley v. State* (1890), 4 Ohio C.C. 425, 428, 1890 WL 324. Thus, no error occurred.

{¶ 129} Leonard also claims that he was denied a fair trial because of an error in the "Not Guilty" verdict form for Count Five. This form did mistakenly contain the word "Guilty" in the upper right-hand corner. Nevertheless, prejudice is lacking. The trial court explained this error to the jury and provided it with a corrected "Not Guilty" verdict form, along with the other verdict forms for Count Five. But Leonard was found guilty of attempted rape, and neither the original nor the corrected "Not Guilty" verdict form was ever used. Thus, we overrule proposition of law 32.

### III. Sentencing Issues

### A. Victim–Impact Statements

{¶ 130} In his second proposition of law, Leonard argues that by allowing victim-impact statements from Flick's family and friends, the trial court weighed an invalid aggravating circumstance when deciding whether to sentence Leonard to death. Contrary to appellate counsel's assertion, the trial court had already accepted the jury's penalty verdict and had sentenced Leonard to death before hearing any victim-impact statements. Therefore, there is no merit to the contention that the trial court considered and weighed these statements in making its determination as to the death sentence. Leonard's second proposition of law is overruled.

### B. Penalty–Phase Instructions

{¶ 131} Leonard contends in proposition of law 15 that the trial court erred by instructing the jury during the penalty phase using the statutory definition of "reasonable doubt" contained in R.C. 2901.05(D). The instruction given in the penalty phase was consistent with the instruction suggested in *State v. Goff* (1998), 82 Ohio St.3d 123, 132, 694 N.E.2d 916. Therefore, we overrule Leonard's 15th proposition of law.

{¶ 132} In proposition 26, Leonard challenges the trial court's penalty-phase instructions, including another challenge to the court's reasonable-doubt instruction. We have rejected Leonard's reasonable-doubt-instruction arguments in the discussions relating to propositions of law 25 and 15. We reject Leonard's remaining claims under this proposition of law for the following reasons.

{¶ 133} There was no error in the trial court's instructions regarding imposing a life sentence. A verdict of life imprisonment is required to be unanimous, and that requirement is constitutional. *State v. Davis*, 62 Ohio St.3d at 351, 581 N.E.2d 1362.

{¶ 134} The trial court also did not err by refusing to instruct on specific R.C. 2929.04(B)(7) mitigating factors that defense counsel believed were supported by the evidence. The trial court instructed the jury to consider "any other factors

that support a penalty less than death or lessen the appropriateness of the death penalty" and permitted defense counsel to argue any nonstatutory mitigating factors raised by the evidence. See *State v. Smith* (1997), 80 Ohio St.3d 89, 109–110, 684 N.E.2d 668.

{¶ 135} The trial court's reference to aggravating "circumstances" tracked the language in R.C. 2929.04 and was not error. In addition, an instruction that a recommendation of death is reviewable by the trial court is not reversible error. See *State v. Carter,* 72 Ohio St.3d at 559, 651 N.E.2d 965; *State v. Woodard* (1993), 68 Ohio St.3d 70, 77, 623 N.E.2d 75; and R.C. 2929.03(D)(2). Moreover, the trial court instructed the jury that its sentencing recommendation should be made as if it "is absolute and will be carried out." The record also reflects that the trial court correctly identified the single aggravating circumstance for the jury's consideration.

{¶ 136} Finally, the trial court's instruction prohibiting the jury's consideration of sympathy was proper. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph three of the syllabus; *State v. Lorraine,* 66 Ohio St.3d at 417–418, 613 N.E.2d 212. For the reasons stated, we overrule proposition of law 26 in its entirety.

### C. Double Jeopardy

{¶ 137} In his 18th proposition of law, Leonard argues that the trial court violated the Double Jeopardy Clause by sentencing him on both the felony-murder charge and the underlying kidnapping and rape charges. But Leonard is mistaken that he was convicted of capital murder based on both attempted rape and kidnapping. Kidnapping was not charged as a death-penalty specification. In addition, the Double Jeopardy Clause "does not preclude a defendant from being separately punished for an aggravated murder and for felonies involved in that murder." *State v. Coley* (2001), 93 Ohio St.3d 253, 264, 754 N.E.2d 1129. See, also, *State v. Nields,* 93 Ohio St.3d at 31, 752 N.E.2d 859; *State v. Reynolds,* 80 Ohio St.3d at 681–683, 687 N.E.2d 1358; *State v. Smith,* 80 Ohio St.3d at 117, 684 N.E.2d 668. Therefore, Leonard's 18th proposition of law is overruled.

### D. Proportionality

{¶ 138} Leonard contends in proposition of law 19 that his death sentence is excessive and disproportionate when compared with other cases in which the death penalty has been imposed. We will address this argument during our independent review of Leonard's death sentence. R.C. 2929.05.

### IV. Ineffective Assistance of Counsel

{¶ 139} In his fourth proposition of law, Leonard makes various claims relating to ineffective assistance of counsel. Reversal of a conviction or sentence based

upon ineffective assistance of counsel requires satisfying the two-pronged test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. *Strickland* requires that the defendant show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. Id. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 140} Leonard raises several claims of ineffective assistance during the guilt-determination phase. He first contends that counsel was deficient for failing to request defense experts. But as we discussed in relation to Leonard's propositions of law one and eight, the record does not reveal any need for experts. Thus, no basis exists to find deficient performance.

{¶ 141} Similarly, we reject Leonard's claims of ineffective assistance of counsel raised in propositions of law 17 and 21. Leonard has not shown that counsel's performance was either deficient or prejudicial. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus, following *Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 142} Leonard also claims that he was prejudiced by trial counsel's lack of experience in capital cases and that lead counsel was not certified pursuant to Sup.R. 20 (formerly C.P.Sup.R. 65). However, during arraignment, the trial court advised Leonard of his right to have counsel appointed who was certified in capital cases. Leonard, instead, chose to retain private counsel. In *State v. Keith* (1997), 79 Ohio St.3d 514, 534, 684 N.E.2d 47, we declined to "impose a rule that creates a presumption of ineffective assistance of counsel where counsel has been retained by or for a defendant and is not qualified under C.P.Sup.R. 65."

{¶ 143} Leonard next argues that counsel was deficient in calling two witnesses in the guilt-determination phase who offered damaging testimony. Leonard claims that testimony from his brother Ted and from Rick Schoeny prejudiced his defense. "Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh,* 90 Ohio St.3d at 490, 739 N.E.2d 749. We conclude that trial counsel's decision to call these witnesses represented reasonable trial strategy.

{¶ 144} Schoeny testified that it was common for Leonard to have guns and that he always carried a gun in his jacket. This testimony was apparently offered to rebut the state's claim that the murder was premeditated. Ted Leonard testified that Leonard had previously threatened to kill people but that he had never taken his brother's threats seriously. This testimony was apparently intended to diminish the impact of the state's evidence that Leonard had previously threatened Flick. And Ted's testimony that Leonard was a good shot supported the defense theory that Leonard did not intend to kill Gries and Minges when he shot at them through the door of Flick's residence. This

strategy was ultimately successful: Leonard was acquitted of both attempted-murder counts. Finally, Ted's testimony that Leonard had admitted killing Flick was not prejudicial in light of Leonard's confession.

{¶ 145} Leonard also claims deficient performance in trial counsel's failure to request a continuance when three subpoenaed defense witnesses failed to appear at the guilt-determination phase of the trial. Defense counsel explained to the court that the witnesses "were not eyewitnesses or anything of that nature" but were subpoenaed to offer "background" information. Leonard has not explained how the failure to ask for a continuance was prejudicial. Moreover, the trial court asked Leonard whether his counsel had consulted with him in regard to the absence of these witnesses, and Leonard said that they had and that he agreed with counsel's decision to proceed without them.

{¶ 146} Leonard also argues that counsel failed to effectively cross-examine Gries and Minges. The extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel. See *State v. Campbell*, 90 Ohio St.3d at 339, 738 N.E.2d 1178; *State v. Otte*, 74 Ohio St.3d at 565, 660 N.E.2d 711; accord *State v. Bradley*, 42 Ohio St.3d at 142–144, 538 N.E.2d 373. Leonard claims that there were several inconsistencies in the testimony of Gries and Minges and that more effective cross-examinations could have bolstered the defense's argument that Flick had consented to having sex with Leonard. But Leonard does not explain what the alleged inconsistencies are or how they could have shown that Flick had consented. Nor are the inconsistencies clear from the record. Thus, we reject Leonard's argument.

{¶ 147} Leonard also claims that counsel were ineffective during the penalty phase of his trial. He first contends that he was prejudiced by the lack of a mitigation expert. But trial counsel did employ a licensed psychiatrist, who presented mitigation evidence in Leonard's behalf. Moreover, Leonard does not explain how an additional mitigation expert would have aided his defense. See, e.g., *State v. Murphy* (2001), 91 Ohio St.3d 516, 542, 747 N.E.2d 765.

{¶ 148} Leonard also questions his counsel's using Dr. James Hawkins, a licensed psychiatrist, as his mitigation expert. Leonard claims that Dr. Hawkins did not understand his role as mitigation expert and his testimony damaged Leonard's chance of receiving a life sentence.

{¶ 149} Judicial scrutiny of counsel's performance must be highly deferential, and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 689–690, 104 S.Ct. 2052, 80 L.Ed.2d 674. Dr. Hawkins's testimony was a key component of the defense theory that Leonard's actions were extremely out of character. Dr. Hawkins explained how Leonard, the product of a loving,

supportive family, with a strong religious upbringing, and a person of good character with no prior criminal history, could commit such violent crimes. We determine that the decision to call Dr. Hawkins reflected reasonable professional judgment. See, e.g., *State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, at ¶ 85–89.

{¶ 150} Moreover, we find that Leonard has not shown how Dr. Hawkins's lack of knowledge regarding specific details of the charged crimes was prejudicial. In fact, Dr. Hawkins explained that this information would not have aided his diagnosis that Leonard suffered from a personality disorder. Leonard has also not shown how Dr. Hawkins's use of the Minnesota Multiphasic Personality Inventory amounted to deficient performance by trial counsel. Dr. Hawkins was the expert in this area, and he determined which tests to administer. See, e.g., *State v. Campbell*, 90 Ohio St.3d at 340, 738 N.E.2d 1178. Leonard has presented no sound rationale to conclude that defense counsel's mitigation strategy was unreasonable. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 151} Leonard raises other ineffective-assistance claims related to the penalty phase. Leonard contends that during opening statement, counsel reversed the penalty-phase balancing test, saying that the life that Leonard had led until the murder outweighed the aggravating factor and that the jury's penalty verdict was only a recommendation. However, the trial court correctly instructed the jury on the legal standards. Thus, any misstatement by counsel was nonprejudicial. See *State v. Stallings* (2000), 89 Ohio St.3d 280, 286, 731 N.E.2d 159.

{¶ 152} In addition, Leonard argues that counsel were deficient by (1) not giving the jury complete information about Leonard's learning disabilities, (2) failing to develop the fact that Leonard's family had cared for foster children while he was growing up, and (3) not adequately developing Leonard's religious beliefs and feelings of remorse. But trial counsel did present testimony in regard to these issues. Leonard's claims that trial counsel were deficient by failing to pursue these facts to a greater extent are based on speculation.

{¶ 153} Finally, Leonard has failed to show how he was prejudiced by trial counsel's requesting a presentence investigation report and court-clinic evaluation. Nothing in the record suggests that the trial court relied on irrelevant or incompetent evidence in sentencing Leonard. See, e.g., *State v. Clemons*, 82 Ohio St.3d at 450, 696 N.E.2d 1009. In fact, the trial court specifically noted that the psychological evaluation was of no value because Leonard refused to be interviewed by the court clinic. Based on the foregoing, we overrule Leonard's proposition of law four and his claims of ineffective assistance of counsel in propositions of law 17 and 21.

{¶ 154} Leonard argues in proposition of law 28 that trial counsel rendered ineffective assistance during the penalty phase by failing to investigate all available mitigating factors. But the record does not support that claim. See *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, at ¶ 59–62. See, also, *Wiggins v. Smith* (2003), 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (in which the court found ineffective assistance of counsel when the *record revealed* that the defendant had had a terrible childhood and that his defense counsel had failed to present evidence of it to the jury). Therefore, we overrule Leonard's 28th proposition of law.

## V. Prosecutorial Misconduct

{¶ 155} In propositions of law three, 20, and 27, Leonard argues that he was denied a fair trial because of prosecutorial misconduct. To determine whether a prosecutor's remarks at trial constituted misconduct, we must determine (1) whether the remarks were improper and (2) if so, whether the remarks prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 156} In his third proposition of law, Leonard complains about comments that the prosecutor made during opening statements and closing arguments of both phases of the trial. Leonard first complains that the prosecutor mentioned certain facts in his guilt-determination-phase opening statement that were not subsequently supported by evidence. His trial counsel objected a number of times to these allegedly improper comments. We find that this claim lacks merit.

{¶ 157} During opening statement, counsel is accorded latitude and allowed fair comment on the facts to be presented at trial. See *Maggio v. Cleveland* (1949), 151 Ohio St. 136, 38 O.O. 578, 84 N.E.2d 912, paragraph two of the syllabus. See, also, e.g., *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 126. Each of the prosecutor's comments at issue here was supported by evidence subsequently offered at trial. Thus, Leonard has failed to establish that any error occurred. See, e.g., *State v. Davis*, 62 Ohio St.3d at 337, 581 N.E.2d 1362. Moreover, the trial court instructed the jury that it must decide the case on the evidence and that opening statements and closing arguments are not evidence. We presume that the jury followed the court's instructions. *State v. Loza* (1994), 71 Ohio St.3d 61, 79, 641 N.E.2d 1082.

{¶ 158} Leonard next complains about comments that the prosecutor made during the guilt-determination-phase closing argument. Leonard contends that the prosecutor expressed a personal opinion as to whether Flick had consented to having sex with Leonard before her death, whether Leonard and Flick had struggled, and whether Leonard had planned to kill Flick. Leonard's failure to

object to these comments waived all but plain error. *State v. Slagle,* 65 Ohio St.3d at 604, 605 N.E.2d 916.

{¶ 159} We determine that no error, plain or otherwise, occurred. A prosecutor may state an opinion if based on evidence presented at trial. *State v. Watson* (1991), 61 Ohio St.3d 1, 9–10, 572 N.E.2d 97; *State v. Tyler,* 50 Ohio St.3d at 41, 553 N.E.2d 576; *State v. Bey* (1999), 85 Ohio St.3d 487, 496, 709 N.E.2d 484. The state presented evidence supporting each of the contested statements.

{¶ 160} Leonard also claims that on two separate occasions, the prosecutor misinformed the jury that it could automatically find Leonard guilty of Specification Two to Counts One and Two (that the aggravated murder occurred during a rape or attempted rape). Again, Leonard's failure to object waived all but plain error. *Slagle,* 65 Ohio St.3d at 604, 605 N.E.2d 916.

{¶ 161} Only once did the prosecutor refer to the jury's findings in regard to these specifications as "automatic." Admittedly, the prosecutor's choice of words was unfortunate. But isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. See *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431; *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068.

{¶ 162} Here, the prosecutor was merely arguing that a guilty verdict on Count One would logically result in the same verdict as to Specification Two to Counts One and Two. Statements made by counsel in closing arguments do not govern the law that should be applied. *State v. Loza,* 71 Ohio St.3d at 79, 641 N.E.2d 1082. The trial court properly charged the jury on all factual issues as to each count and specification charged in the indictment. Thus, plain error is absent.

{¶ 163} Leonard further claims that he was prejudiced by the prosecutor's remark that Leonard "deserves no break." He also claims that the prosecutor improperly referred to the penalty phase during his guilt-determination-phase closing arguments. Trial counsel did not object to the prosecutor's "no break" comment, and no outcome-determinative plain error occurred as a result of the remark. See, e.g., *State v. Bies* (1996), 74 Ohio St.3d 320, 326, 658 N.E.2d 754, citing *State v. Long,* 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

{¶ 164} We find, however, that the prosecutor erred by referring to Leonard's penalty during the guilt-determination phase. See *State v. Brown,* 38 Ohio St.3d at 316, 528 N.E.2d 523. The prosecutor's specific comments were as follows:

{¶ 165} "The defense has asked you to find the defendant guilty of Count One and Two, of murder and gun [specification], but not of either of the specifications that would take us to the second part of the trial where you would decide what the appropriate penalty is as we talked about in voir dire.

{¶ 166} "By finding the defendant guilty of murder and a gun specification and felonious assault, we would not get to that second part where more evidence would be presented, and then you would deliberate again to decide what the appropriate penalty is.

{¶ 167} "Remember, only by finding Patrick Leonard guilty of either Count One or Count Two, and either Specification One or Specification Two to either of those counts, will we even get to the penalty phase where his future will be decided."

{¶ 168} The prosecutor's comments could be interpreted as urging the jury to convict Leonard solely to impose the death sentence. See *Brown*; *State v. Hicks* (1989), 43 Ohio St.3d 72, 75, 538 N.E.2d 1030. But Leonard failed to object, and for the following reasons, we find that the prosecutor's comments did not rise to the level of plain error.

{¶ 169} First, the trial court instructed the jurors to decide the case on the evidence alone and explained that arguments of counsel were not evidence. Second, the weight of the evidence against Leonard, including his confession, was substantial and "reduced the likelihood that the jury's decision was influenced by argument." See *Darden v. Wainwright* (1986), 477 U.S. 168, 182, 106 S.Ct. 2464, 91 L.Ed.2d 144. Third, as was the case in *Darden,* the prosecutor's comments did not manipulate or misstate the evidence, nor did they implicate other specific rights of the accused. Id. Finally, the prosecutor's comments should not be taken out of context and given their most damaging meaning. *Donnelly v. DeChristoforo,* 416 U.S. at 647, 94 S.Ct. 1868, 40 L.Ed.2d 431. After setting forth the state's case, the prosecutor urged the jury to carefully consider the evidence before reaching a determination regarding guilt. When viewed in this light, the remarks of the prosecutor did not deprive Leonard of a fair trial and did not result in outcome-determinative plain error.

{¶ 170} Leonard next contends that the record is replete with the prosecutor's personal attacks against him. Leonard cites three specific instances: one in which the prosecutor said that Leonard had lied to Flick, another in which he said that Leonard is a liar, and a third in which Leonard claims that the prosecutor said that Leonard is a bad father and is manipulative and controlling. Leonard failed to object to these and other similar comments by the prosecutor. We conclude that plain error is absent.

{¶ 171} The prosecutor never referred to Leonard as a "bad father" but did refer to him on several occasions as a liar and as manipulative and controlling. A prosecutor's characterization of defendant as a liar or by other derogatory terms is generally improper. See, e.g., *State v. Clemons,* 82 Ohio St.3d at 452, 696 N.E.2d 1009; *State v. Brown,* 38 Ohio St.3d at 317, 528 N.E.2d 523. But we have permitted such comments when they fall short of being "purely abusive" or were

based on evidence presented at trial. See, e.g., id.; *Clemons* at 452, 696 N.E.2d 1009; *State v. Nields*, 93 Ohio St.3d at 37–38, 752 N.E.2d 859; *State v. Hill*, 75 Ohio St.3d at 204, 661 N.E.2d 1068; *State v. Wilson*, 74 Ohio St.3d at 399, 659 N.E.2d 292. In this case, the prosecutor's characterizations of Leonard amounted to fair comment based on the evidence at trial. None of the comments were so egregious that they materially prejudiced Leonard or deprived him of a fair trial. Cf. *State v. Keenan* (1993), 66 Ohio St.3d 402, 613 N.E.2d 203.

{¶ 172} Leonard also claims that prosecutorial misconduct occurred during the penalty phase. He first contends that during opening statement, the prosecutor gave his personal opinion by stating, "One thing I do feel confident in, is that no matter what [the defense] produce[s] for you in mitigation, it will come nowhere close to the heavy weight that [the prosecutors] feel that you should attach to the aggravating circumstances." Leonard failed to object to this comment. A similar opening statement was found to be nonprejudicial in *State v. Reynolds*, 80 Ohio St.3d at 680–681, 687 N.E.2d 1358, in which we held, "The general rule is that 'where personal opinions of guilt are predicated upon the evidence, though frowned upon, they are not deemed to be prejudicially erroneous.' * * * It is difficult for prosecutors to argue vigorously for the death penalty without making statements that can be arguably construed as statements of personal opinion." Id., quoting *State v. Stephens* (1970), 24 Ohio St.2d 76, 83, 53 O.O.2d 182, 263 N.E.2d 773. Thus, we reject Leonard's argument.

{¶ 173} Leonard also contends that the prosecutor misstated the penalty-phase weighing process. We find any error harmless. Leonard did not object, and the trial court instructed on the proper standard to apply in the weighing process. See *State v. Smith* (2000), 87 Ohio St.3d 424, 444, 721 N.E.2d 93.

{¶ 174} Leonard further contends that the prosecutor committed misconduct by referring to the jury's penalty-phase verdict as a recommendation. But the prosecutor's comments "neither reduced the jury's sense of responsibility nor increased the possibility of a recommendation of death in reliance upon the appellate process." *State v. Bedford* (1988), 39 Ohio St.3d 122, 124, 529 N.E.2d 913; accord *State v. Woodard*, 68 Ohio St.3d at 77, 623 N.E.2d 75.

{¶ 175} We also reject Leonard's argument regarding the prosecutor's commenting on Leonard's unsworn statement. See *State v. Smith*, 87 Ohio St.3d at 444, 721 N.E.2d 93, and *State v. Davis*, 76 Ohio St.3d at 119–120, 666 N.E.2d 1099.

{¶ 176} Leonard makes several additional claims of prosecutorial misconduct. In each instance, Leonard failed to object and waived all but plain error. *State v. Slagle*, 65 Ohio St.3d. at 604, 605 N.E.2d 916. The prosecutor's comments regarding the victim's mental anguish and his asking the jury to be fair to the victim were improper but not prejudicial. See, e.g., *State v. Combs* (1991), 62

Ohio St.3d 278, 282–283, 581 N.E.2d 1071; *State v. Brooks,* 75 Ohio St.3d at 158, 661 N.E.2d 1030. None of the remaining statements that Leonard complains about constituted misconduct, let alone plain error. See *State v. Wilson,* 74 Ohio St.3d at 399, 659 N.E.2d 292 (prosecutors can urge the merits of their cause). Based on the foregoing, we overrule Leonard's third proposition of law.

{¶ 177} In proposition of law 20, Leonard claims that he was denied a fair trial by "discriminatory charging and prosecution actions." But Leonard fails to explain how the prosecutor acted improperly by charging him with capital murder or how he was denied a fair trial as a result of the prosecutor's actions. In any event, "the existence of discretion in the charging stage of a capital prosecution does not violate the Constitution." *State v. Nields,* 93 Ohio St.3d at 38, 752 N.E.2d 859; see, e.g., *State v. Coleman* (1989), 45 Ohio St.3d 298, 308, 544 N.E.2d 622; *Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859. Leonard's 20th proposition of law is overruled.

{¶ 178} Leonard argues in proposition 27 that he was denied a fair trial as a result of prosecutorial misconduct that occurred throughout his trial. Except in two instances, Leonard merely restates the claims of prosecutorial misconduct set forth in his third proposition of law. As to the new claims raised in this proposition, the transcript pages cited do not reflect any misconduct. Furthermore, to the extent that Leonard is contending that the cumulative effect of misconduct impaired the overall fairness of his trial, this argument is without merit as well. See, e.g., *State v. Landrum,* 53 Ohio St.3d at 113, 559 N.E.2d 710; *State v. Smith,* 87 Ohio St.3d at 444–445, 721 N.E.2d 93. Cf., *State v. Keenan,* 66 Ohio St.3d 402, 613 N.E.2d 203; *State v. Fears* (1999), 86 Ohio St.3d 329, 715 N.E.2d 136. Proposition of law 27 is overruled.

## VI. Constitutionality/Settled Issues

{¶ 179} Leonard claims in proposition of law seven that Ohio's death-penalty statutes violate various international laws. We overrule this claim on the authority of *State v. Ashworth* (1999), 85 Ohio St.3d 56, 70, 706 N.E.2d 1231, and *State v. Phillips,* 74 Ohio St.3d at 103–104, 656 N.E.2d 643.

{¶ 180} Leonard's argument in proposition of law 13 challenging the constitutionality of the requirement that mitigating factors be proven by a preponderance of the evidence is without merit. *State v. Jenkins,* 15 Ohio St.3d at 171–172, 15 OBR 311, 473 N.E.2d 264; *Delo v. Lashley* (1993), 507 U.S. 272, 275–276, 113 S.Ct. 1222, 122 L.Ed.2d 620.

{¶ 181} In his 16th proposition of law, Leonard raises various constitutional challenges to Ohio death-penalty statutes. We reject these challenges. Ohio's capital-sentencing scheme is constitutional. See, e.g., *State v. Clemons,* 82 Ohio St.3d at 454, 696 N.E.2d 1009; *State v. Evans* (1992), 63 Ohio St.3d 231, 253–254,

586 N.E.2d 1042; *State v. Smith* (1991), 61 Ohio St.3d 284, 294, 574 N.E.2d 510; *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293; *State v. Taylor,* 78 Ohio St.3d at 32, 676 N.E.2d 82; *State v. Jenkins,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; and *State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668. Leonard also argues that Ohio's death-penalty laws violate international treaties. We rejected the same argument under proposition of law seven. Therefore, we summarily overrule propositions of law 13 and 16.

## VII. Other Issues

### A. Incomplete Record

{¶ 182} Leonard contends in proposition 14 that his conviction and sentence must be reversed because the trial court failed to maintain a complete record of all proceedings as prescribed by Crim.R. 22. Off-the-record conferences were held during the proceedings. However, Leonard failed to object or ask that these conferences be recorded and has waived this issue. *State v. Brewer* (1990), 48 Ohio St.3d 50, 60–61, 549 N.E.2d 491; *State v. Grant* (1993), 67 Ohio St.3d 465, 481, 620 N.E.2d 50.

{¶ 183} "The requirement of a complete, full, and unabridged transcript in capital trials does not mean that the trial record must be perfect for purposes of appellate review." *State v. Palmer* (1997), 80 Ohio St.3d 543, 687 N.E.2d 685, syllabus. Moreover, a reversal will not occur as a result of unrecorded proceedings when the defendant failed to object and fails to demonstrate material prejudice. Id. at 554, 687 N.E.2d 685. See, also, *State v. Goodwin* (1999), 84 Ohio St.3d 331, 340, 703 N.E.2d 1251.

{¶ 184} Leonard speculates that crucial rulings were made during these unrecorded conferences. Significantly, appellate counsel failed to invoke the procedures of App.R. 9(C) or 9(E) to reconstruct the off-the-record conferences or to establish their importance. In fact, the subjects discussed during many of these unrecorded conferences are clear from the transcript, and it is clear that they were not crucial. As to the remaining unrecorded conferences identified under this proposition, Leonard has not shown, nor does the record reveal, that these conferences concerned matters vital to appellate review. See, e.g., *State v. Brewer,* 48 Ohio St.3d at 60–61, 549 N.E.2d 491; *State v. Nields,* 93 Ohio St.3d at 26–27, 752 N.E.2d 859. Accordingly, we overrule proposition of law 14.

### B. Cumulative Error

{¶ 185} In proposition 29, Leonard contends that his death sentence is inappropriate and must be reversed. Leonard argues that the cumulative effect of errors committed at trial undermine the reliability of his sentence. However, the errors committed at this trial do not compel invocation of the cumulative-error

doctrine set forth in *State v. DeMarco* (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256, paragraph two of the syllabus. See, e.g., *State v. Moore* (1998), 81 Ohio St.3d 22, 41, 689 N.E.2d 1. Leonard received a fair trial; the errors committed during trial were harmless or nonprejudicial, cumulatively as well as individually. See, e.g., *State v. Goff*, 82 Ohio St.3d at 140, 694 N.E.2d 916. Leonard's 29th proposition of law is overruled.

## VIII.  Independent Sentence Evaluation

### A.  Penalty Phase

{¶ 186} During the penalty phase, Leonard called ten mitigation witnesses, made an unsworn statement, and introduced documentary evidence.

{¶ 187} Dr. James Hawkins, a licensed psychiatrist, interviewed Leonard on two occasions, consulted with a psychologist who performed some psychological tests on Leonard, examined various records relating to Leonard and this crime, and conducted a psychiatric evaluation.

{¶ 188} Psychological testing showed that Leonard has a performance IQ score of 117, and a verbal IQ score of 93. Leonard has a full-scale IQ of 103, which is average. Dr. Hawkins noted that Leonard has "a learning disability and had some special-educational experiences to compensate for that." Test results showed that Leonard is "a loner, that he is sensitive to criticism, and that he's sensitive to humiliation and rejection." Leonard also "tends to bottle up his emotions, [and] feels somewhat personally inadequate."

{¶ 189} Dr. Hawkins concluded that Leonard is not mentally ill but that he does suffer from a personality disorder. Dr. Hawkins characterized Leonard's personality disorder as an inability to manage anger and control his rage. In Dr. Hawkins's opinion, Leonard was experiencing a "disassociative reaction" when he killed Flick. Leonard felt betrayed by Flick and became enraged to such a degree that he lost the ability to control himself. Dr. Hawkins also testified that Leonard's personality disorder would benefit from anger-management group therapy.

{¶ 190} On cross-examination, Dr. Hawkins identified Leonard as suffering from a schizoid-personality disorder. Dr. Hawkins also agreed that Leonard is not legally insane and can distinguish right from wrong.

{¶ 191} Several of Leonard's family members and friends also testified regarding Leonard's history, character, and background. Leonard was the product of loving and supportive parents. Leonard's parents instilled discipline and responsibility in their children, and the entire family was actively involved with the Catholic church. Leonard was one of ten children, and the Leonard family also raised several foster children. Leonard was described as gentle, caring, and

nurturing and as being devoted to his family. Leonard was also described as being a good father to his son.

{¶ 192} While growing up, Leonard liked to play sports, especially soccer, and was good with horses. He attended summer camp, where he was a counselor and excelled as a leader. Leonard struggled in school but worked hard and graduated from high school. After high school, Leonard went to work with his brothers as a carpenter and eventually became a master carpenter.

{¶ 193} People who had known Leonard and his family for years described him as a good person from a good family who was always helpful to others. Leonard did not drink alcohol, smoke, or take drugs. Prior to this incident, Leonard was not considered violent and had not been in trouble with police. The fact that Leonard had committed these crimes was described as shocking and extremely out of character.

{¶ 194} Father David duPlantier, a minister and long-time friend of the Leonard family, began giving spiritual guidance to Leonard shortly after the murder. Father duPlantier testified that Leonard had talked openly with him about his relationship with God and had expressed remorse for his actions. He also observed that Leonard seemed to have a rapport with the guards and other prisoners and that it seemed to him that the guards considered Leonard to be a well-behaved and respectful person. Finally, several witnesses testified that there is a lot of good left in Leonard and that he can help people and become a useful member of society.

{¶ 195} In his unsworn statement, Leonard told the jury that he was sorry for what he had done and that he accepted full responsibility. He expressed sorrow that his children would one day "understand what I did." He also said that he and Flick had loved each other and had been trying to work things out and that he had "no excuse for taking [Flick's] life." Leonard indicated that if he "had been thinking clearly, this would not have happened." Finally, Leonard said, "I will spend the rest of my life devoted to my children, to be a positive influence on them and anyone else I come in contact with. * * * And I will spend the rest of my life trying to make up for [the murder]."

## B. Sentence Evaluation

{¶ 196} For purposes of independent review, the two counts of aggravated murder of a single victim must be merged. *State v. Lawson* (1992), 64 Ohio St.3d 336, 351, 595 N.E.2d 902. After independent assessment, we find that the evidence established beyond a reasonable doubt the single R.C. 2929.04(A)(7) aggravating circumstance proven against Leonard. Leonard murdered Flick during the commission of an attempted rape, and he was the principal offender in the aggravated murder.

{¶ 197} We find nothing in the nature and circumstances of the offenses that is mitigating. Leonard held Flick at gunpoint, handcuffed her, and attempted to rape her. Leonard then shot Flick three times in the head at close range.

{¶ 198} In contrast, Leonard's history, character, and background provide several mitigating features. Numerous witnesses attested to Leonard's good character, moral upbringing, dedication to his family, support of his son, leadership ability, service to the community, and his desire to help others. Additionally, evidence was introduced regarding Leonard's history of steady employment since high school and his skills as a master carpenter. Therefore, his history, character, and background are entitled to weight in mitigation. See, e.g., *State v. Fox* (1994), 69 Ohio St.3d 183, 194, 631 N.E.2d 124; and *State v. Brewer*, 48 Ohio St.3d at 64, 549 N.E.2d 491.

{¶ 199} As to the statutory mitigating factors, Leonard's lack of a prior criminal record is entitled to significant weight in mitigation. R.C. 2929.04(B)(5). See *State v. White* (1999), 85 Ohio St.3d 433, 454, 709 N.E.2d 140. Leonard's personality disorder, the love and support of his family, his ability to adjust to confinement, and his ability to train others in carpentry qualify as "other factors" under R.C. 2929.04(B)(7) and are entitled to some weight. See, e.g., *State v. Fox*, 69 Ohio St.3d at 194–195, 631 N.E.2d 124. Leonard's confessing to the murder is also entitled to weight under R.C. 2929.04(B)(7), but its weight is limited. Leonard admitted killing Flick, but certain aspects of his version were inconsistent with the evidence. See, e.g., *State v. White*, 85 Ohio St.3d at 456, 709 N.E.2d 140. Finally, Leonard's expression of remorse in his unsworn statement is entitled to limited weight. See *State v. Keene* (1998), 81 Ohio St.3d 646, 671, 693 N.E.2d 246.

{¶ 200} The remaining statutory mitigating factors are inapplicable: R.C. 2929.04(B)(1) (victim inducement); (B)(2) (duress, coercion, or strong provocation); (B)(3) (mental disease or defect); (B)(4) (youth of the offender); and (B)(6) (accomplice only). Leonard was 30 years old at the time of the murder.

{¶ 201} Based on the evidence, we find that the aggravating circumstance of this murder, attempted rape, outweighs Leonard's combined mitigating factors beyond a reasonable doubt. Therefore, we conclude that the death penalty is appropriate in this case.

{¶ 202} Finally, in proposition of law 19, Leonard contends that his sentence is excessive and disproportionate when compared with other cases in which the death penalty has been imposed. Based on our independent review, we overrule this argument and find that the penalty imposed here is not excessive when compared with similar cases in which death sentences have been approved. See, e.g., *State v. Powell* (1990), 49 Ohio St.3d 255, 552 N.E.2d 191; *State v. Phillips*,

74 Ohio St.3d 72, 656 N.E.2d 643; *State v. Mason,* 82 Ohio St.3d 144, 694 N.E.2d 932; *State v. Scudder,* 71 Ohio St.3d 263, 643 N.E.2d 524.

{¶ 203} Accordingly, Leonard's convictions and sentences, including the sentence of death, are affirmed.

Judgment affirmed.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON and O'DONNELL, JJ., concur.

_____

Michael K. Allen, Hamilton County Prosecuting Attorney, and Ronald W. Springman Jr., Assistant Prosecuting Attorney, for appellee.

Faulkner & Tepe, L.L.P., A. Norman Aubin and Herbert E. Freeman, for appellant.