[Cite as *State v. Eddy*, 2011-Ohio-2034.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 95370**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## TYRELL EDDY

DEFENDANT-APPELLANT

---

**JUDGMENT:**
**AFFIRMED**

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-521296

**BEFORE:**    Boyle, J., Blackmon, P.J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:**    April 28, 2011

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
Leader Building, Suite 940
526 Superior Avenue
Cleveland, Ohio   44114


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor
BY:   Erica Barnhill
Assistant County Prosecutor
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113


MARY J. BOYLE, J.:

{¶ 1}   Defendant-appellant, Tyrell Eddy, appeals his aggravated robbery and carrying a concealed weapon convictions.   He raises two assignments of error for our review:

{¶ 2}   "[1.] The trial court erred in denying Appellant's motion for acquittal as to the charges when the state failed to present sufficient evidence to sustain a conviction.

{¶ 3}   "[2.] Appellant's convictions are against the manifest weight of the evidence."

{¶ 4}   Finding no merit to his appeal, we affirm.

Procedural History and Factual Background

{¶ 5} The grand jury indicted Eddy on two counts: aggravated robbery, in violation of R.C. 2911.01(A)(1), with one- and three-year firearm specifications, as well as a two-year body armor specification and a forfeiture specification; and carrying a concealed weapon, in violation of R.C. 2923.12(A)(2). The following facts were presented to the jury.

{¶ 6} Jonathan Putmon testified that on February 7, 2009, he called a Cleveland-based chat line to try to meet someone. He began talking to Eddy on the chat line. He told Eddy that his name was Jaymyiah. After talking for a long time, they agreed to meet in person. They set a designated meeting place, where they met each other at approximately 5:20 p.m. They walked and talked until approximately 5:45 p.m., when Eddy pulled out a gun and pointed it at the back of Putmon's neck. Eddy told Putmon to "take everything out," and "give me your stuff." Putmon gave Eddy his cell phone, his identification card, his bus fare, and his bus identification card. After Eddy took the items from Putmon, Eddy hit Putmon on the side of his head with the gun, causing Putmon to need stitches. Eddy told Putmon to run and to keep quiet.

{¶ 7} Putmon ran away from Eddy until he saw a police officer and flagged him down. He told the officer that he had been robbed at gunpoint and told the officer that the person who robbed him was 16 or 17 years old, approximately 126 pounds, and wearing a blue "hoodie." The officer broadcast the description over the police radio.

{¶ 8} Police officers in the area saw a man matching the description of the suspect running through a backyard and broadcasted that information on the police radio. Other officers who were in the vicinity received the call, and saw a suspect matching the description walking down a driveway. They stopped their car and told the suspect to "come to them." But the man, who turned out to be Eddy, took off running. The officers chased him for about ten seconds before they caught him.

{¶ 9} When searching Eddy, the officers found a .38 revolver in Eddy's front pocket. The officers also discovered that Eddy was wearing a bulletproof vest. The officers then took Eddy to where Putmon was located, and Putmon identified Eddy as the man who had just robbed him at gunpoint.

{¶ 10} Detective Joseph Daugenti testified that he interviewed Eddy in custody in the presence of two other officers. Detective Daugenti stated that after reading Eddy his *Miranda* rights, Eddy gave an oral statement. Eddy told Detective Daugenti that he had gotten on the chat line that day, and knew he was talking to a male. He said that Putmon was supposed to give him "a blow job." Eddy explained that he planned to meet Putmon at a designated meeting place. When he met up with Putmon, Eddy told Detective Daugenti that he "pulled out a gun and took his property." Eddy further told Detective Daugenti that he hit Putmon on the head because Putmon tried to grab Eddy's gun. Eddy said he threw Putmon's property on the ground when he was running from police. Eddy also told Detective Daugenti

that he thought Putmon would "be an easy mark, \*\*\* that he wasn't going to hurt him, that he just wanted to make some money."

{¶ 11} Detective Gerald Sowul testified that he was present when Eddy gave his oral statement to Detective Daugenti. Detective Sowul corroborated Detective Daugenti's testimony regarding Eddy's statement.

{¶ 12} At the close of the state's case, Eddy moved for a Crim.R. 29 acquittal, which the trial court denied.

{¶ 13} Eddy denied that he robbed Putmon, explaining that he only told police that he robbed Putmon because he believed that is what they wanted to hear. Eddy testified that he did get on the chat line that day, talked to Putmon, and agreed to meet him. But Eddy stated that when he met up with Putmon, Putmon tried to kiss him, and "grabbed [his] private part." Eddy told Putmon "no," hit Putmon in the head with his gun, and took off running.

{¶ 14} As for the bulletproof vest, Eddy testified that he found it. He did not know it was a bulletproof vest. He wore it as a "workout vest."

{¶ 15} At the close of all of the evidence, Eddy again moved for a Crim.R. 29 acquittal, which the trial court again denied.

{¶ 16} The jury found Eddy guilty of both charges and all of the specifications. The trial court sentenced Eddy to ten years in prison: three years on the firearm specifications and two years on the body armor specification, both terms to be served consecutive to a five-year

term for the aggravated robbery. The trial court then sentenced Eddy to six months for carrying a concealed weapon, to be served concurrently to the aggravated robbery charge. The trial court also ordered that Eddy's handgun be forfeited and notified Eddy that he would be subject to five years of mandatory postrelease control when he was released from prison.

Sufficiency of the Evidence

{¶ 17} Eddy argues that the state's evidence was not sufficient to convict him of aggravated robbery. But his argument relating to his robbery conviction only centers on the victim's credibility. Thus, we will address this argument in the next section dealing with manifest weight of the evidence. He further argues that the evidence was not sufficient to convict him of the firearm and body-armor specifications, which we will address here.

{¶ 18} When an appellate court reviews a record upon a sufficiency challenge, "'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶77, quoting *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶ 19} Eddy maintains that the state failed to prove the firearm "could have been rendered operable at the time of the offense." As the state points out, however, Eddy stipulated that the firearm was operable.

{¶ 20} As for the body-armor specification, the state had to prove that Eddy was wearing "any vest, helmet, shield, or similar item that is designed or specifically carried to diminish the impact of a bullet or projectile upon the offender's body." R.C. 2941.1411(B). After reviewing the record, we conclude that the state did so in this case.

{¶ 21} The state presented the testimony of Officer Leonard Butler, who testified that based on his training and experience, he was familiar with bulletproof vests; "[he] wore one every day." While he was patting Eddy's chest for safety purposes, he felt the vest and knew it was a bulletproof vest.

{¶ 22} Detective Sowul identified the vest in court and testified that it "appear[ed] to be a ballistic vest made by the Second Chance Company." He then proceeded, at the state's instruction, to open the vest in front of the jury, which confirmed that it was manufactured by Second Chance. Detective Sowul then opened the panel of the "carrier," the outer part of the vest, to reveal the "actual ballistic panel," which he explained provides the protection from bullets. He further explained that the label of the vest stated that it was a "Tri Flex" vest made by Second Chance Body Armor Company, and was a "Level II body armor, *** rated

by the National Institute of Justice to stop a .37 Magnum round as well as a 9 millimeter round."

{¶ 23} Accordingly, we conclude that the state presented sufficient evidence to prove beyond a reasonable doubt that Eddy was wearing body armor and that the firearm was operable.

{¶ 24} Eddy's first assignment of error is overruled.

<u>Manifest Weight of the Evidence</u>

{¶ 25} As we stated, Eddy's arguments regarding his aggravated robbery conviction center upon the victim's credibility. He argues that the jury lost its way because "from the onset, the alleged victim lied to the police about what happened and he admitted as much under oath."

{¶ 26} In reviewing a claim challenging the manifest weight of the evidence, "[t]he question to be answered is whether there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Internal quotes and citations omitted.) *Leonard* at ¶81.

{¶ 27} Putmon admitted on cross-examination that he gave several different stories to the police as to how he met Eddy, and about his use of the Cleveland chat line. First, Putmon stated that he was simply robbed by someone he did not know when he got off the bus. Then, he told police that he had used the chat line, but said he thought he was talking to a female, not a male. But Putmon explained that it was because he was embarrassed for people, especially his mother, to know that he was using the chat line. Further, Detective Daugenti explained that throughout all of Putmon's "stories" about what happened leading up to the robbery, one thing did not change, i.e., the actual robbery — that he was robbed by someone at gunpoint and hit in the head with the gun.

{¶ 28} Accordingly, we conclude that the jury did not lose its way when it found Eddy guilty of aggravated robbery. It clearly believed Putmon over Eddy, which was in its purview to do — especially when Eddy admitted to robbing Putmon at gunpoint, and telling Detective Daugenti that he thought Putmon to be an "easy target."

{¶ 29} Eddy's second assignment of error is overruled.

Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been

affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_____
MARY J. BOYLE, JUDGE

PATRICIA ANN BLACKMON, P.J., and
EILEEN A. GALLAGHER, J., CONCUR