[Cite as *State v. Ingram*, 2011-Ohio-6629.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 96509

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JAMES INGRAM

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-541399

**BEFORE:**    Boyle, J., Stewart, P.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:**    December 22, 2011

**ATTORNEY FOR APPELLANT**

Michael V. Heffernan
75 Public Square
Suite 700
Cleveland, Ohio   44113


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor
BY:   Brett Kyker
Assistant County Prosecutor
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113


MARY J. BOYLE, J.:

**{¶ 1}** Defendant-appellant, James Ingram, appeals his conviction for theft, raising the following two assignments of error:

**{¶ 2}** "I.   Mr. Ingram's conviction was against the manifest weight of the evidence.

**{¶ 3}** "II.   The inconsistent verdict in this case requires reversal."

**{¶ 4}** Finding no merit to the appeal, we affirm.

<u>Procedural History and Facts</u>

**{¶ 5}** In September 2010, Ingram was indicted on four counts: two counts of burglary — one in violation of R.C. 2911.12(A) and one in violation of R.C.

2911.12(A)(3); one count of theft in violation of R.C. 2913.02(A)(1); and one count of safecracking in violation of R.C. 2911.31(A). Ingram pleaded not guilty to the indictment, and the matter proceeded to a jury trial where the following evidence was presented.

{¶ 6} The victim, Marjorie Dixon, age 80, lived in Cleveland, where she had resided for the last 40 years. In lieu of an insurance policy, Dixon stored $11,000 in cash in a Brink's home safe, unlocked, in her home. Dixon testified that the money was intended to cover her funeral expenses following her death.

{¶ 7} Dixon is Ingram's paternal grandmother. According to Dixon, no one other than Ingram had a key to her house. She further testified that Ingram knew that she kept $11,000 in cash in her house.

{¶ 8} On July 1, 2010, Dixon returned home from a weekend in Michigan and found no signs of forced entry into her home but noticed that "somebody [had] been rambling around." She later checked her safe and discovered that the $11,000 was missing. Dixon testified that, upon discovering that her money was gone, she "knew James had taken it." Dixon, however, decided not to confront Ingram. Shortly thereafter, a bank statement addressed to Ingram was sent to Dixon's residence. (Ingram had used his grandmother's address for purposes of the account.) Dixon opened the bank statement and discovered that Ingram had over $9,000 in the bank, despite not having ever held a job.

**{¶ 9}** The state also offered the testimony of Sandra Monsman, a Charter One Bank representative from the Euclid office. Monsman testified that Ingram opened an account with Charter One on June 28, 2010, depositing $9,900 in cash. Since that time, there have been no other deposits made but several withdrawals. Monsman further testified that "any deposit of $10,000 or more needs to be reported" to the federal agencies and that Ingram's deposit fell below that threshold.

**{¶ 10}** The state further offered as an exhibit a certified record showing that Ingram had not filed any tax returns for 2007, 2008, or 2009.

**{¶ 11}** Shirley Ingram testified on her son's behalf, stating that her son was a good person who saved his money. Although she never knew her son to have a permanent job, she testified that he had done "odds-and-ends jobs" and that he earned money selling "oils and CDs." On cross-examination, she acknowledged that Ingram's last employment was probably 20 years ago and that he had a prior felony conviction for drug trafficking.

**{¶ 12}** Ingram testified on his own behalf, stating that he was 40 years old and that he had always had a good relationship with Dixon — his grandmother. He explained that he has always helped her and his father with the properties that they owned and managed.

**{¶ 13}** In describing his current source of income, Ingram testified as follows:

{¶ 14} "Well, actually, what I do, I do landscaping for one of the persons at the church. He got his own little landscaping thing, different houses. I sell oils always, T-shirts, you know, mix tapes that DJs make and I save money. I mean, I don't — it's not like, you know, I could save 3,000 or 4,000 a year, it's a period of time, you know."

{¶ 15} On cross-examination, Ingram clarified that he has not done odd jobs for his father since the 1990s but that he has been earning money buying items wholesale, i.e., purses, t-shirts, oils, mix tapes, and selling them. He acknowledged that he opened the Charter One account in June 2010 and that his other accounts had been nearly depleted at that time. The activity on the other accounts revealed a consistent stream of withdrawals but no deposits.

{¶ 16} Ingram further testified that he did not steal any money from his grandmother. While he acknowledged that he did have a key to his grandmother's house, he testified that he returned the key "around" June 2010 and that other people had keys to his grandmother's house.

{¶ 17} The jury found Ingram guilty of a single count of theft with the furthermore clauses that the victim was elderly and that the value of the property was more than $5,000 but less than $25,000. The jury acquitted Ingram of the other counts, and the trial court subsequently sentenced him to one year in prison. The trial court further informed Ingram that he would be subject to three years of mandatory postrelease control.

<u>Manifest Weight of the Evidence</u>

{¶ 18} In his first assignment of error, Ingram argues that his conviction is against the manifest weight of the evidence. He contends that the jury wrongly believed Dixon's testimony that he was the only one with a key to her house when there was evidence demonstrating otherwise.

{¶ 19} In reviewing a claim challenging the manifest weight of the evidence, "[t]he question to be answered is whether there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Internal quotes and citations omitted.) *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶81.

{¶ 20} The gravamen of Ingram's argument is that the jury wrongly believed his grandmother over him. But it is entirely within the jury's province to assess the credibility of the witnesses and believe one over another. Here, we cannot say that the jury lost its way simply because it found Ingram's testimony not credible. Indeed, Ingram's testimony was inconsistent with his own actions leading to his arrest, including his claim that he "saved" the $9,900 over time despite his near depletion of his other bank accounts and his lack of any consistent employment. Accordingly, after reviewing the entire record, we conclude that this case is not the "exceptional case in which the

evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.

{¶ 21} The first assignment of error is overruled.

Inconsistent Verdicts

{¶ 22} In his second assignment of error, Ingram argues that the jury's guilty finding on the theft count cannot stand because it is inconsistent with the jury's acquittal on the two burglary counts. He contends that, because the jury found him not guilty of the burglary counts, it should have also acquitted him of the theft count. We disagree.

{¶ 23} First, we fail to see any inconsistency between these verdicts. The jury's finding of guilt on the theft count did not preclude a not guilty finding on the burglary counts. Indeed, the jury could have easily believed that Ingram was not trespassing in his grandmother's home when he stole the money.

{¶ 24} Second, even assuming that these verdicts were inconsistent, this is not grounds for reversal. Inconsistent verdicts on different counts of a multicount indictment do not justify overturning a verdict. *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶137. "The several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count." Id., quoting *State v. Adams* (1978), 53 Ohio St.2d 223, 374 N.E.2d 137, paragraph two of the syllabus.

**{¶ 25}** The second assignment of error is overruled.

Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, JUDGE

MELODY J.   STEWART, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR