[Cite as *State v. Holmes*, 2015-Ohio-5050.]

### IN THE COURT OF APPEALS OF OHIO
### THIRD APPELLATE DISTRICT
### HANCOCK COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,          CASE NO. 5-15-06

     v.

LAWRENCE W. HOLMES,          O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Hancock County Common Pleas Court
Trial Court No. 2014CR94

Judgment Affirmed

Date of Decision: December 7, 2015

APPEARANCES:

    *Tim A. Dugan for* Appellant

    *Elizabeth H. Smith for* Appellee

**SHAW, J.**

{¶1} Defendant-appellant Lawrence W. Holmes ("Holmes") appeals the January 26, 2015 judgment of the Hancock County Common Pleas Court sentencing Holmes to serve 4 years in prison after Holmes was found guilty in a jury trial of Felonious Assault in violation of R.C. 2903.11(A)(2), a felony of the second degree.

{¶2} The facts relevant to this appeal are as follows. On April 5, 2014, at approximately 8:30 a.m. Holmes was at his residence with his girlfriend Tammy Theiss ("Tammy") when their mutual friend Joe Ehlinger ("Joe") came over with a 12-pack of beer. Holmes and Joe drank the beer then went to a bar along with Tammy to have a pitcher of beer and play pool.

{¶3} After leaving the bar, they picked up a pizza and returned to Holmes's residence. Upon returning to Holmes's residence, Joe gave Holmes $40 to purchase some crack-cocaine, so Holmes left in his vehicle. Joe and Tammy went inside and ate the pizza, and a short time later Holmes returned, agitated, without the crack-cocaine. When Joe and Tammy both asked Holmes for Joe's money, Holmes became further agitated and broke the glass living-room table. Holmes then gave Joe his money back and ordered Joe and Tammy to leave.

{¶4} According to Tammy, Holmes then began choking her, and Joe intervened, at which point Holmes began to strike Joe. Joe got away from Holmes

when Tammy drew Holmes's attention and Joe ran out the front door into the yard. Subsequently Holmes told Tammy to leave, and pushed her toward the door. Tammy fell near the front door and fractured two bones in her leg. Holmes initially asked Joe to help get Tammy out of his house, but when Joe indicated that they were going to have to get an ambulance Holmes grew further enraged at Joe.

{¶5} Joe and Tammy both indicated that Holmes then picked up a wooden two-by-four and started chasing Joe. Joe stated that when he started to create a little distance between himself and Holmes, Holmes threw the two-by-four at him and it struck Joe in the back of the head.

{¶6} While Holmes chased Joe, Tammy called 9-1-1 and police officers responded to the scene. Tammy was taken to the hospital and treated for her injuries. Joe refused treatment.

{¶7} On April 15, 2014, Holmes was indicted for two counts of Felonious Assault. (Doc. No. 1). The first count was related to Joe and alleged that Holmes knowingly caused or attempted to cause physical harm to Joe by means of a deadly weapon—specifically, a two-by-four—on April 5, 2014, in violation of R.C. 2903.11(A)(2), a felony of the second degree. (*Id.*) The second count related to Tammy and alleged that Holmes knowingly caused her serious physical harm in violation of R.C. 2903.11(A)(1), a felony of the second degree. (*Id.*) On April 23, 2014, Holmes was arraigned and he pled not guilty to the charges. (Doc. No. 9).

{¶8} On December 8-10, 2014, the case proceeded to a jury trial. After jury selection the trial began by the jury viewing the premises in question. At trial the State called five witnesses, which included Tammy, Joe, and three of the officers who responded to the scene of the incident on April 5, 2015. Multiple pictures were also introduced into evidence depicting the interior of Holmes's residence, pictures of Joe's injuries, and pictures of Tammy's injuries. The two-by-four was also entered into evidence. In addition, the parties stipulated, *inter alia*, that Tammy's injuries constituted serious physical harm.

{¶9} After the State rested its case, Holmes took the stand in his own defense, testifying that Tammy fell while he was out chasing Joe, and that he was not even around when she fell. Holmes also testified that when he threw the two-by-four at Joe he only intended to scare him, not hit him. At the conclusion of Holmes's testimony, the defense rested its case.

{¶10} The parties proceeded to closing arguments and the trial court then instructed the jury on the applicable law. Ultimately the jury found Holmes guilty of the Felonious Assault related to Joe, but not guilty of the Felonious Assault related to Tammy. The trial court ordered a pre-sentence investigation and the matter was set for sentencing.

{¶11} On January 22, 2015, the case proceeded to sentencing. At the sentencing hearing the State requested that Holmes be sentenced to serve 7 years

in prison based in part on Holmes's criminal and drug history. The defense requested that Holmes be sentenced to a minimum 2-year sentence. Holmes then made a statement continuing to maintain that he did nothing wrong. After hearing the arguments of the parties, the trial court ordered Holmes to serve a 4-year prison term. A judgment entry memorializing Holmes's sentence was filed January 26, 2015.

{¶12} It is from this judgment that Holmes appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE STATE FAILED TO PROVIDE LEGALLY SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION FOR FELONIOUS ASSAULT WITH A DEADLY WEAPON.**

**ASSIGNMENT OF ERROR 2**
**APPELLANT'S CONVICTION FOR FELONIOUS ASSAULT FELL AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*First Assignment of Error*

{¶13} In Holmes's first assignment of error he argues that there was insufficient evidence to convict him. Specifically Holmes contends that the State did not present sufficient evidence that the two-by-four constituted a deadly weapon, and that the State did not establish that Joe was harmed by Holmes as a result of being struck by the two-by-four.

{¶14} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* When an appellate court reviews a record upon a sufficiency challenge, " 'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard,* 104 Ohio St.3d 54, 2004–Ohio–6235, ¶ 77, quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶15} In this case Holmes was convicted of Felonious Assault in violation of R.C. 2903.11(A)(2), which reads, "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon[.]"

{¶16} "Deadly weapon" is defined in R.C. 2923.11(A)[1] as, "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."

{¶17} At trial the State called five witnesses in order to convict Holmes of Felonious Assault beginning with Tammy Theiss. Tammy testified that in April of 2014 she was dating Holmes and she was living with him at his residence in Findlay. Tammy testified that on April 5, 2014, she was awakened by Joe

---

[1] Revised Code 2903.11(E)(1) states that "deadly weapon" has the same meaning as it does in R.C. 2923.11.

knocking on the door of the residence at approximately 8:30-9 a.m. Tammy testified that she had met Joe through Holmes a couple years prior, and that Joe and Holmes were friends. Tammy testified that she and Holmes had just gone to bed a few hours prior to Joe's arrival so she asked Joe to leave, but Holmes told Joe he could stay.

{¶18} Tammy testified that Joe brought a 12-pack of beer with him, and that Holmes and Joe drank the entire 12-pack within 30 minutes. Tammy testified that Joe and Holmes then wanted to go to "Nikki's Bar" so she drove them to the bar.

{¶19} Tammy testified that Holmes and Joe drank a pitcher of beer at the bar, then Joe suggested they get a pizza, so they all left the bar, picked up a pizza, and returned to Holmes's residence. Back at Holmes's residence, Tammy testified that Joe gave Holmes money to get some crack-cocaine. Tammy testified that Holmes then left in his own vehicle, and was gone about 15-20 minutes.

{¶20} Tammy testified that when Holmes returned he did not have the crack. Tammy testified that Joe then asked for his money back, and Holmes was not acknowledging him. Tammy testified that she then told Holmes to give Joe his money back and then "all hell broke loose." (Tr. at 189). Tammy testified that Holmes struck the glass table in the living room and it shattered. Tammy testified that Holmes then came at her and had his hands around her throat. According to

Tammy, as she tried to get loose Joe approached Holmes and Holmes let her go and turned toward Joe. Tammy testified that Holmes then began punching Joe in the face.

{¶21} Tammy testified that she then called out to Holmes and drew his attention, allowing Joe to get away. Tammy testified that Joe ran out the door while Holmes's attention was focused on her and then Holmes told her to get out. Tammy testified that while she was reaching to get her phone and leave, Holmes pushed on her, and that she eventually fell, breaking her leg. Tammy testified that she did not believe it was Holmes's intention to break her leg, that she felt he just wanted her to leave.

{¶22} Tammy testified that after she fell Holmes called out to Joe to try and get him to come back and get Tammy. Tammy testified that Joe came back and indicated they were going to have to call an ambulance for Tammy. According to Tammy, Holmes then said, "you just fucked up" to Joe, then Holmes picked up a nearby two-by-four and started chasing after Joe. Tammy testified that they ran out of sight, and she called 9-1-1.

{¶23} The 9-1-1 call was played for the jury. Tammy stated in the call that her boyfriend broke her leg and that he was chasing her friend down the street with a two-by-four. (State's Ex. 8). In the call Tammy stated that she did not know if her boyfriend "killed him or what." (*Id.*)

**{¶24}** Tammy testified that the police eventually arrived and she was ultimately taken to the hospital and treated for her injuries, which included her fractured leg.

**{¶25}** On cross-examination, the defense emphasized through Tammy's testimony that on the night before the alleged incident, and in the early morning hours on the date of the alleged incident, Joe and Tammy were smoking crack-cocaine at Joe's residence. Tammy testified that because they had been smoking crack-cocaine the night before she did not want Joe to come in when he arrived at Holmes's residence at 8:30 in the morning. She testified that she did not think they needed "to get started again." (Tr. at 227).

**{¶26}** Tammy also testified that Holmes had a bad temper, that she knew he was getting angry on the date of the incident, but she whole-heartedly believed that Holmes had no intent to break her leg.

**{¶27}** The State next called Joe Ehlinger. Joe corroborated Tammy's testimony that he arrived at Holmes's residence at approximately 8:30 a.m. on April 5, 2014, with a 12-pack of beer. Joe further corroborated that he and Holmes drank the 12-pack, went to Nikki's bar, got a pizza, then returned to Holmes's residence. Joe also testified that he gave Holmes $40 to go purchase crack-cocaine for him, and that Holmes drove off in his car to go get it.

**{¶28}** Joe testified that Holmes returned without the crack-cocaine and was reluctant to give Joe his money back. Joe testified that Holmes was agitated upon returning, and that he ultimately smashed the glass table in the living room, then went after Tammy. Joe testified that Holmes put his hands around Tammy's throat. At that time, Joe testified that he screamed for Holmes to stop. Joe testified that as soon as he touched Holmes to try and get him to stop, Holmes turned toward him and started repeatedly hitting him. Joe testified that he put his hands up to deflect the blows, but a few got through. Joe testified that he then attempted to get out of the house.

**{¶29}** Joe testified that Tammy drew Holmes's attention, and at that point he ran out of the house into the yard. Joe testified when he looked back he heard Tammy screaming in pain and Holmes was saying "get this bitch off the porch." (Tr. at 252). Joe testified that when he walked up to the porch and saw Tammy's leg he said that she needed an ambulance. Joe testified that Holmes then said, "You just fucked up," and grabbed a two-by-four that was nearby. (Tr. at 253). Joe testified that he ran, and Holmes ran full speed after him, chasing him with the two-by-four. Joe testified that he believed if Holmes would have gotten to him he would have killed him. (Tr. at 253).

**{¶30}** Joe testified when he started to "put a little distance" between himself and Holmes, indicating Holmes was not going to catch him, Holmes threw

the two-by-four at him and it hit him in the head. Holmes testified that he kept running and told the neighbors to call 9-1-1.

{¶31} Joe testified that the police arrived, that he spoke with them, and that they took pictures of his abrasions. Joe also identified the two-by-four he was struck with and the two-by-four was entered into evidence. Joe testified that as a result of being hit by the board he had a "knot" or "goose egg" on the back of his head that took 2-3 days to heal. Joe testified that he refused medical attention.

{¶32} Next the State called three officers who responded to the scene. The first was Sergeant Michael Swope of the Findlay Police Department. Sergeant Swope testified that he went to Holmes's residence to assist the police officers who had been dispatched there. Sergeant Swope testified that upon arrival he observed one officer helping with Tammy and one officer speaking with Joe. Sergeant Swope testified that Holmes was not there when he arrived but Holmes returned a little while later, highly agitated and excited. Sergeant Swope testified that Holmes calmed down enough and wanted to tell his side of the story to Sergeant Swope, but as Holmes talked he kept becoming agitated and going on tangents so he never got his story out.

{¶33} Sergeant Swope testified that Holmes was ultimately arrested and placed in a patrol car. Sergeant Swope testified that Holmes was very agitated in

the patrol car and that he banged his head multiple times on the screen separating the back seat from the front.

**{¶34}** Sergeant Swope testified that he located the two-by-four in question in the yard. Sergeant Swope testified that based on his training and experience the two-by-four was capable of inflicting death.

**{¶35}** On cross-examination Sergeant Swope testified that he looked at the area Joe had indicated he had been struck by the two-by-four and he did not see an injury because it was in Joe's hairline. (Tr. at 302).

**{¶36}** The State next called Officer Jordan Cramer, who also responded to the scene. Officer Cramer corroborated Sergeant Swope's testimony, and also testified that he took Joe's written statement, photographed the scene and located the two-by-four. Officer Cramer testified that he did observe a small bruise on Joe's neck from where Joe indicated he had been struck by the two-by-four. This small bruise was exhibited in a photograph, State's Ex. 22. Officer Cramer also testified that he had training in weapons, and based on his training he believed that the two-by-four was capable of inflicting death through blunt force trauma.

**{¶37}** Lastly, the State called Officer Kevin Cieplowski. Officer Cieplowski corroborated the testimony of the two prior officers, adding that he helped prepare Tammy to be transported to the hospital.

{¶38} At the conclusion of the State's case, and at the close of evidence, Holmes made a Crim.R. 29 motion for acquittal. The motion was overruled by the trial court. On appeal, Holmes now renews his argument that the State presented insufficient evidence to convict him. Specifically, Holmes argues that there was not sufficient evidence presented that the two-by-four could qualify as a deadly weapon. Holmes contends that it was not established that the two-by-four could cause death, or that it could cause death being thrown rather than used as a bludgeon. In addition, Holmes argues that there was no testimony as to Joe having any injuries caused by the two-by-four.

{¶39} First, there was testimony directly from Joe that he was injured as a result of Holmes throwing the two-by-four at him. Joe testified that he had a "knot" or a bruise on his head that lasted a few days as a result of being struck. In addition, Officer Cramer testified that he observed an abrasion on the back of Joe's neck where Joe indicated he had been struck by the board. That abrasion was photographed and that photograph was introduced into evidence. Thus there was testimony that Joe was injured as a result of being struck by the two-by-four.

{¶40} Nevertheless, even if there was not the preceding testimony, Joe clearly testified that Holmes chased him with the two-by-four and that Joe thought Holmes would kill him if he caught him. Joe clearly testified that Holmes threw the two-by-four at him, and the two-by-four was located in the yard, as Joe's

testimony suggested. The statute at issue does not require physical harm, rather it requires that Holmes cause *or attempt to cause* physical harm by means of a deadly weapon. R.C. 2903.11(A)(2). Joe's testimony would certainly allow a jury to find an attempt to cause physical harm, even if actual physical harm was not proven.

{¶41} Dealing next with Joe's claim that there was not adequate testimony to establish the two-by-four was a deadly weapon, both Sergeant Swope and Officer Cramer testified that the two-by-four was capable of inflicting death. The following specific exchange occurred during Sergeant Swope's direct testimony.

> **Q: Based on your training and your experience as an officer and a Sergeant, is it your opinion that a wooden 2 by 4 could be capable of inflicting death?**
>
> **A [Sergeant Swope]: Absolutely.**
>
> **Q: Based on your training and you[r] experience as an officer and a Sergeant, is it your opinion that [this] specific 2 by 4 that was inside the bag marked as Exhibit 7 could be capable of inflicting death?**
>
> **A: Yes.**

(Tr. at 299).

{¶42} Officer Cramer then also testified on direct that the two-by-four was capable of inflicting death. In an exchange with the prosecutor, Officer Cramer testified as follows.

-14-

**Q: Throughout your training and your experience to become a police officer, did you have any training in regards to weapons?**

**A [Officer Cramer]: Yes.**

**Q: And did you have any training in regards to everyday objects being used as weapons?**

**A: Yes.**

**\* \* \***

**Q: In your training and experience, was there ever an instance where any examples of a 2 by 4 being used as a weapon?**

**A: Yes.**

**Q: That was throughout your experience or your training as an officer?**

**A: Throughout my training, yes.**

**Q: During your training was it shown to you that a 2 by 4 or a wooden board could be capable of inflicting death?**

**A: Yes.**

**Q: What did you learn through your training? How was that shown to be able to be capable of inflicting death?**

**A: Probably striking with such force towards the head area to cause blunt force trauma to [the] back of the head could cause serious injury or death from the board.**

**Q: Based on your training and your experience as an officer, is your experience that specifically the 2 by 4 that's contained within Exhibit 7 could be capable of inflicting death?**

**A: Yes.**

Case No. 5-15-16

(Tr. at 319-320).

{¶43} Not only did two officers testify that the two-by-four used in this case was capable of inflicting death, but the two-by-four was also entered into evidence. Thus the jury could see the board for itself. Based on the testimony of the two officers in this case, there was certainly sufficient evidence to allow a jury to determine whether the two-by-four could constitute a deadly weapon based on the instructions it was given.[2] Therefore Holmes's arguments on this issue are not well-taken, and his first assignment of error is overruled.

*Second Assignment of Error*

{¶44} In Holmes's second assignment of error he argues that even if there was sufficient evidence to convict him his conviction was against the manifest weight of the evidence.

{¶45} The Ohio Supreme Court has "carefully distinguished the terms 'sufficiency' and 'weight' in criminal cases, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, ¶ 10, quoting *State v. Thompkins,* 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

---

[2] We would note that finding that a two-by-four, or a similar piece of wood, can constitute a deadly weapon is consistent with caselaw from this Court and other Ohio Appellate Courts. *See State v. McAlphine* 8th Dist. Cuyahoga No. 79216, 2002 WL 120529 (two-by-four capable of inflicting death or serious injury); *In re Fortney*, 4th Dist. Washington No. 05CA5, 2005-Ohio-3618 (a large stick four feet in length and six inches in circumference can be deadly weapon); *State v. Murray*, 11th Dist. Lake No. 2003-L-045, 2005-Ohio-1693 (a table leg—called a stick in the case—can be a deadly weapon when used as a club); *State v. Pope*, 3d Dist. Logan No. 8-89-19, 1990 WL 157268 (Oct. 4, 1990) (toilet plunger handle can be deadly weapon).

**{¶46}** Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *Thompkins*, *supra*, at 387. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id.* In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Andrews,* 3d Dist. Allen No. 1–05–70, 2006–Ohio–3764, ¶ 30, quoting *Thompkins* at 387.

**{¶47}** In this case, after the State rested, Holmes proceeded to his case-in-chief and he testified on his own behalf. Holmes testified that the events on the morning of April 5, 2014, up to him breaking the table were essentially the same as Joe and Tammy had testified. However, Holmes testified that the table broke when he slammed coasters onto it. He also testified that he then went to remove Tammy from his residence, but he never touched her. Holmes testified that Joe then attacked him, so Holmes took a single swing at Joe and Joe took off running.

{¶48} Holmes testified that he did pick up the two-by-four and he followed Joe. Holmes testified that Tammy was injured while he followed Joe. Holmes also testified that he threw the two-by-four only to scare Joe, and that the two-by-four did not actually hit Joe. Holmes testified that when he went back to his residence he saw Tammy and that she had broken her leg.

{¶49} On cross-examination Holmes testified contrary to Tammy's testimony that Tammy was not his girlfriend. He also testified that when Joe gave him the money for crack he was never actually going to buy crack because he did not have anywhere to buy it from. In addition, Holmes testified that he was agitated on the date of the incident because of the way Tammy was treating him.

{¶50} On appeal, Holmes claims that the State did not establish that Holmes knowingly attempted to cause physical harm with the two-by-four. Holmes argues that no one could verify any injury to Joe's head, and that Holmes testified the board actually missed Joe's head. Further, Holmes argues that he never intended to hurt Joe; rather he only intended to scare Joe.

{¶51} Despite Holmes's arguments, the jury was presented with testimony from Joe and from an officer that there was an abrasion on Joe's neck. Joe specifically testified that he had a lump for 2-3 days from the two-by-four striking him in the head. The jury elected not to believe Holmes's version of events,

which is wholly within the jury's purview as factfinder. The jury was also in a far better position to judge the witnesses' credibility.

{¶52} Moreover, in this case the jury was presented with uncontroverted evidence that Holmes chased Joe with a two-by-four. The jury believed Joe's testimony that Holmes threw the two-by-four and it struck him, or believed that Holmes at least attempted to cause Joe physical harm with the two-by-four. Based on the testimony and exhibits introduced into the record at trial we cannot find that the jury clearly lost its way or created a manifest miscarriage of justice. Accordingly, Holmes's second assignment of error is overruled.

{¶53} Having found no error in the particulars assigned, Holmes's assignments of error are overruled and the judgment of the Hancock County Common Pleas Court is affirmed.

*Judgment Affirmed*

**ROGERS, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**